**CURRENT TECHNOLOGY CONCEPTS, INC., Plaintiffs,**

v.

**IRIE ENTERPRISES, INC., d/b/a Irie Computer, et al., Defendants.**

No. C1-94-289.

Supreme Court of Minnesota.

April 28, 1995.

Mark J. Frenz, Margaret K. Savage, Briggs and Morgan, Minneapolis, for plaintiffs.

Robert G. Morrison, pro hac vice, Ann Arbor, MI, for defendants.

## OPINION

PAGE, Justice.

This case presents certified questions from the United States District Court, District of Minnesota, which ask us to determine whether an agreement between Irie Enterprises, Inc. (Irie), a Michigan corporation, and Current Technology Concepts, Inc. (CTC), a Minnesota corporation, constitutes a franchise governed by the Minnesota Franchise Act (the Act), Minn.Stat. §§ 80C.01–.30 (1994).[1] The claims underlying this action arose when Irie terminated an agreement between the two corporations which gave CTC the right to market Irie's computer software and hardware products. In response to Irie's termination of the agreement, CTC filed suit in the U.S. District Court, District of Minnesota, alleging, among other things, that Irie violated the Act. The court, Judge Donald Lay presiding,[2] concluded as a matter of law that the Act applied to the agreement and that Irie violated the Act. A jury trial was held on the issue of damages and the jury returned a verdict of $1.3 million in CTC's favor. Irie moved for judgment as a matter of law, a new trial, or

---

1. The Act provides, in relevant part:

    Subd. 4. "Franchise" means (a) a contract or agreement, either express or implied, whether oral or written, for a definite or indefinite period, between two or more persons:

    (1) by which a franchisee is granted the right to engage in the business of offering or distributing goods or services using the franchisor's trade name, trademark, service mark, logotype, advertising, or other commercial symbol or related characteristics;

    (2) in which the franchisor and franchisee have a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise; and

    (3) for which the franchisee pays, directly or indirectly, a franchise fee; * * *

    \* \* \* \* \* \*

    (f) "Franchise" does not include any contract, lease or other agreement whereby the franchisee is required to pay less than $100 on an annual basis * * *.

    Minn.Stat. § 80C.01, subd. 4 (1994).

2. Senior U.S. Circuit Judge sitting by designation as a judge for the U.S. District Court, District of Minnesota.

remittitur, and, as a result, Judge Lay certified, pursuant to Minn.Stat. § 480.061 (1994), four questions to this court. As we have rephrased them,[3] the questions we answer are:

1. Was the $125,000 payment required by the CA$H Agreement consideration for the Reseller Agreement such that the payment constitutes a "franchise fee" under the Act?

2. Are the parties' Reseller Agreements excluded from coverage under the Act by the exception to the Act found in Minn.Stat. § 80C.01, subd. 4(f), which provides that a franchise does not include any agreement whereby the franchisee is required to pay less than $100 on an annual basis?

We answer the first question in the affirmative. We answer the second question in the negative. We decline to answer the federal district court's certified questions as to: (a) whether the relationship between CTC and Irie, based on the overall evidence, constituted a franchise to be governed by the Minnesota Franchise Act; and (b) whether the damage award was too speculative, remote, or conjectural or excessive. Neither question presents an issue "as to which it appears * * * there is no controlling precedent" in our prior decisions. Minn.Stat. § 480.061, subd. 1 (1994); *In re Medill*, 119 B.R. 685 (Bankr.D.Minn.1990) (holding that certification should be confined to instances where the state supreme court has never addressed the dispositive issue or has indicated a willingness to change the substantive rule of law).

In an agreement (CA$H Agreement) dated June 22, 1989, CTC purchased from Irie a computer software program designed, for billing purposes, to track and monitor the use and distribution of a hospital's durable, reusable medical equipment. The program is called the Computerized Asset System for Hospitals (CA$H System). CTC agreed to pay Irie $125,000 for the CA$H System. As part of the consideration for the CA$H Agreement, Irie agreed to enter into a separate Reseller Agreement (Reseller Agreement) with CTC allowing CTC to resell Irie's other software and hardware products. Irie entered into this Reseller Agreement with CTC on June 22, 1989. On December 23, 1990, CTC and Irie renewed the Reseller Agreement (Renewal Agreement) for a term of 36 months.[4]

On April 2, 1992, Irie sent CTC a letter terminating the Renewal Agreement. Irie's stated reason for terminating the Renewal Agreement was that CTC's account was delinquent. The letter provided that CTC had 30 days to cure the alleged delinquency by paying its outstanding balance to Irie. CTC

---

3. The certified questions provide that "the Minnesota Supreme Court should not be bound by the precise wording of the certified questions, and should feel free to rephrase the issues in light of the record in order to fully answer them." The questions originally read in relevant part as follows:

1. Under the circumstances, does the consideration set forth in the CA$H Agreement for the Reseller Agreement constitute a "franchisee fee" as provided in the Minnesota Franchise Act, Minnesota Statutes § 80C.01 *et seq.*? *See* Minn.Stat. § 80C.01, subds. 4(3) and 9 (1992).

2. The Reseller Agreement contains the terms of payment as follows: (i) payments to IRIE for demonstration copies based on a percentage (5%) of the list price of the software; (ii) payments to IRIE for hardware at prices that exceeded the bona fide wholesale price and "License Fees"; (iii) the sharing of revenue based on a percentage of IRIE's list price for the products sold by CTC; (iv) payments for an advertis-

ing program featuring and promoting IRIE's name and products; and (v) payments for the employment of sales personnel. Do any or all of the above payments and fees made by CTC constitute compliance with the $100 annual requirement of the Minnesota Franchise Act?

3. Under Minnesota law, based on the overall evidence, did the relationship between CTC and IRIE constitute a franchise to be governed by the Minnesota Franchise Act?

4. Under the evidence presented in this case, applying Minnesota law, can the verdict be sustained or should it be set aside as being (a) too speculative, remote or conjectural, or (b) excessive?

4. The date on the first page of the Renewal Agreement is December 23, 1990. However, Irie apparently failed to sign the contract until March 26, 1991. Because we do not believe it affects our resolution of the certified questions, we assume, without deciding, that the parties intended the 36–month period to begin on December 23, 1990.

believed that Irie terminated the Renewal Agreement to usurp from CTC the market that CTC created for Irie's products. In response to the termination letter, CTC filed this lawsuit on April 29, 1992. In its amended complaint, CTC alleged Irie: (1) breached the covenant of good faith implicit in the CA$H Agreement; (2) breached various warranties under the CA$H agreement; (3) breached the covenant of good faith implicit in the Renewal Agreement; (4) violated the Minnesota Franchise Act, Minn.Stat. §§ 80C.01–.30 (1994); (5) violated the Sales Representative Agreement Act, Minn.Stat. § 325E.37 (1994); (6) engaged in defamation and trade libel; and (7) engaged in tortious interference with contract.[5] After discovery, the court ordered the parties to file cross-motions for partial summary judgment on whether the Act applied to the parties' relationship. The court denied Irie's motion and granted CTC's, concluding that the Act applied and that Irie had violated the Act's registration and termination-notice provisions.

A jury trial was held on the issue of CTC's damages. At that trial, CTC presented the only evidence regarding damages. That evidence projected CTC's lost profits resulting from the Renewal Agreement's termination at $1,364,109. The jury returned a verdict in CTC's favor and awarded CTC $1.3 million in damages. The trial court reduced the award by the amount the jury calculated was outstanding on CTC's account with Irie, and entered judgment for CTC in the amount of $1,277,113.27. Irie's motion for judgment as a matter of law, a new trial, or remittitur resulted in the trial court's certification of the questions we now consider.

Under Minnesota law, a franchise is an agreement: (1) by which the franchisee is granted the right to offer or distribute goods using the franchisor's commercial symbol or related characteristics; (2) in which the parties have a community of interest in the marketing of goods or services; and (3) for which the franchisee pays a franchise fee. Minn.Stat. § 80C.01, subd. 4(a) (1994). Our franchise law, however, excludes from the definition of franchise any agreement "whereby the franchisee is required to pay less than $100 on an annual basis." Minn. Stat. § 80C.01, subd. 4(f) (1994).

The first certified question asks whether the $125,000 payment required by the CA$H Agreement was consideration for the Reseller Agreement such that the payment constitutes a franchise fee under the Act.

"Franchise fee" means any fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement, including, but not limited to, the payment either in lump sum or by installments of an initial capital investment fee, any fee or charges based upon a percentage of gross or net sales whether or not referred to as royalty fees, any payment for goods or services, or any training fees or training school fees or charges * * *.

Minn.Stat. § 80C.01, subd. 9 (1994).

Relying on paragraph 8.0[6] of the CA$H Agreement, CTC argues the $125,000 it paid for the CA$H System was also consideration for the right to enter into the business of becoming a "reseller" of Irie software and hardware products and thus constituted the payment of a franchise fee under the Act. Irie argues that when read together, paragraphs 6.1[7] and 8.0 of the CA$H Agreement are in conflict and, therefore, that the agreement is ambiguous as to whether the $125,000 payment constitutes consideration solely for the CA$H System or for both the CA$H System and the Reseller Agreement. Irie

---

5. The CA$H Agreement contains a mandatory arbitration provision. At a preliminary hearing, all of the claims subject to that arbitration provision were dismissed.

6. Paragraph 8.0 of the CA$H Agreement provides:

As part of the consideration for this Agreement, IRIE agrees to enter into a Reseller Agreement with CTC allowing CTC to resell other software and hardware Products of IRIE.

7. Paragraph 6.1 of the CA$H Agreement provides:

6.1 CTC shall pay IRIE for ownership of the CA$H System a sum not to exceed One Hundred Twenty-five Thousand Dollars ($125,-000.00).

further argues that because CTC was responsible for drafting the agreement, any ambiguity should be construed against CTC.

The determination of whether a contract is ambiguous is a question of law. *Lamb Plumbing & Heating Co. v. Kraus-Anderson*, 296 N.W.2d 859, 862 (Minn.1980). In making that determination, a court must give the contract language its plain and ordinary meaning. *Employers Mut. Liab. Ins. Co. v. Eagles Lodge*, 282 Minn. 477, 479, 165 N.W.2d 554, 556 (1969). A contract must be interpreted in a way that gives all of its provisions meaning. *Independent Sch. Dist. No. 877 v. Loberg Plumbing & Heating Co.*, 266 Minn. 426, 436, 123 N.W.2d 793, 799–800 (1963). A contract is ambiguous if its language is reasonably susceptible of more than one interpretation. *Metro Office Parks Co. v. Control Data Corp.*, 295 Minn. 348, 351, 205 N.W.2d 121, 123 (1973); *Lamb*, 296 N.W.2d at 862. If a contract is ambiguous, it must be construed against its drafter. *Lowry v. Kneeland*, 263 Minn. 537, 541, 117 N.W.2d 207, 210 (1962).

We do not find paragraphs 6.1 and 8.0 of the CA$H Agreement in conflict and, therefore, we conclude that the CA$H Agreement is not ambiguous. It is well-settled that one promise may act as consideration for multiple promises. *See, e.g.,* Restatement (Second) of Contracts § 80 cmt. a (1981) ("A single performance or return promise may thus furnish consideration for any number of promises."); *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 629 (Minn.1983) (citing Restatement (Second) of Contracts § 80, cmt. a (1981)). Here, the $125,000 payment from CTC was consideration for the promises contained in paragraphs 6.1 and 8.0 of the CA$H Agreement. Although it is true, as Irie argues, that paragraph 6.1 indicates CTC paid the $125,000 for the CA$H System, paragraph 6.1 does not indicate the payment was exclusively for the CA$H System. To read exclusivity into paragraph 6.1 would leave paragraph 8.0 without meaning, violating the rule that contracts are to be interpreted to give every provision meaning. Thus, we conclude that the $125,000 payment required by the CA$H Agreement for the CA$H System also served as consideration for the Reseller Agreement and, therefore, constitutes a "fee * * * that a franchisee * * * agrees to pay for the right to enter into a business" under the Act. Minn.Stat. § 80C.01, subd. 9. We answer the first certified question in the affirmative.

The second certified question we consider asks whether the parties' Reseller and Renewal Agreements are excluded from the Act's coverage because of the exception to coverage found in Minn.Stat. § 80C.01, subd. 4(f) (1994). Subdivision 4(f) provides that a "'[f]ranchise' does not include any contract, lease or other agreement whereby the franchisee is required to pay less than $100 on an annual basis * * *."

When interpreting a statute, our role is to effectuate the intention of the legislature. *Peterson v. Haule*, 304 Minn. 160, 170, 230 N.W.2d 51, 57 (1975). In doing so, we construe technical words according to their technical meaning and other words according to their common and approved usage and the rules of grammar. Minn.Stat. § 645.08 (1994). When the language of a statute, so construed, is not ambiguous, a court must apply its plain meaning. *McCaleb v. Jackson*, 307 Minn. 15, 17 n.2, 239 N.W.2d 187, 188 n.2 (1976). A statute is ambiguous if it is reasonably susceptible to more than one interpretation. *Tuma v. Commissioner of Economic Sec.*, 386 N.W.2d 702, 706 (Minn.1986). Our reading of Minn. Stat. § 80C.01, subd. 4(f), leads us to conclude that it is at best ambiguous.

When the language of a statute is ambiguous, we apply the rules of statutory construction which allow us to examine the legislative history surrounding the statute's enactment to assist in interpreting the statute.[8] Minn.Stat. § 645.16 (1994). The Minnesota Franchise Act, Minn.Stat. §§ 80C.01–.30, is remedial legislation. *Martin Investors, Inc. v. Vander Bie*, 269 N.W.2d 868, 874 (Minn.1978). When engaging in

---

8. The parties did not, either in their briefs or oral argument to the court, direct our attention to the legislative history of subdivision 4(f). However, in order to determine subdivision 4(f)'s meaning, we have reviewed the legislative history sua sponte.

statutory construction, we interpret remedial legislation broadly to better effectuate its purpose. *Harrison v. Schafer Constr. Co.,* 257 N.W.2d 336 (Minn.1977). We interpret exceptions contained within remedial legislation narrowly. *Nordling v. Ford Motor Co.,* 231 Minn. 68, 77, 42 N.W.2d 576, 582 (1950).

The language that is now subdivision 4(f) was added to the statute by the Act of July 1, 1981, ch. 165, § 1, 1981 Minn.Laws 492, 493. Mary Brophy, Commissioner of the Securities and Real Estate Division of the Commerce Department, testifying in support of the amendment before the state senate's Consumer Protection Subcommittee of the Commerce Committee,[9] indicated that subdivision 4(f) "excludes certain direct sales which were not contemplated by" the Act. Hearing on S.F. No. 443, *Subcomm. on Consumer Protection of the Comm. on Commerce,* 72nd Minn.Leg., March 17, 1981 (audio tape). Commissioner Brophy was the only person to offer an explanation of subdivision 4(f).

The term "direct sale" generally involves the concept of selling products directly from the manufacturer to the ultimate consumer. *See* Irving J. Shapiro, *Dictionary of Marketing Terms* 80 (1981) (defining "direct selling" and "direct marketing" as "the activity of selling to consumers or industrial users without the use of middlemen," and also referring the reader to "direct channel," defined as "[a] channel of distribution characterized by the absence of middlemen. The maker sells directly to the user."); *Dictionary of Marketing Terms* 58–59 (Peter D. Bennett ed., 1988) (defining "direct selling" as a "[p]rocess whereby the firm responsible for production sells to the user, ultimate consumer, or retailer[10] without intervening middlemen"); *Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp.,* 365 U.S. 1, 4, 81 S.Ct. 435, 437, 5 L.Ed.2d 377, 381 (1961) (noting that where the sales contract prohibited resale of natural gas by purchaser, the parties

had engaged in a "direct" sale of natural gas).

Based on the legislative history of subdivision 4(f) and our understanding of the term "direct sale," we conclude that the exception to the Act found in subdivision 4(f) was not intended to apply to the Reseller and Renewal Agreements between CTC and Irie because the agreements did not contemplate Irie engaging in a direct sale of its software and hardware products to the ultimate users or consumers. Having concluded that subdivision 4(f) was not intended to apply to the Reseller and Renewal Agreements between Irie and CTC, we answer the second certified question in the negative.

In response to the first certified question, we hold that the consideration required by the CA$H Agreement for the CA$H System also served as consideration for the Reseller Agreement and, therefore, constitutes a "franchise fee" under the Act. In response to the second certified question, we hold that the Reseller and Renewal Agreements between CTC and Irie are not excluded from the Act's coverage by Minn.Stat. § 80C.01, subd. 4(f).

STRINGER, J., took no part in the consideration or decision of this case.

---

**9.** According to statements made at that hearing, Commissioner Brophy and her staff helped draft subdivision 4(f), which was one of a number of amendments proposed by the Commerce Department. Hearing on S.F. No. 443, *Subcomm. on Consumer Protection of the Comm. on Commerce,* 72nd Minn.Leg., March 17, 1981 (audio tape)

(comments of Senator Tennessen, sponsor of the bill).

**10.** Based on the facts before us, we believe the term "retailer" contained in this definition does not apply to this case.