**DAWN EQUIPMENT COMPANY, Plaintiff–Counterclaim Defendant–Appellee,**

and

**James H. Bassett, Counterclaim Defendant–Appellee,**

v.

**MICRO–TRAK SYSTEMS, INCORPORATED, Defendant–Appellant.**

No. 98–2010.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1998.

Decided Aug. 4, 1999.

Patrick M. Kinnally, Edward Foote (argued), Murphy, Hupp, Foote, Mielke & Kinnally, Aurora, IL, for Dawn Equipment Company and James H. Bassett.

Gregory E. Barrett, Schlueter, Ecklund, Olson, Barrett & Mayfield, Rockford, IL; Theodore R. Plunkett, Daniel W. McDonald (argued), Merchant, Gould, Smith, Edell, Welter & Schmidt, Minneapolis, MN, for Micro–Trak Systems, Incorporated.

Before COFFEY, ROVNER and DIANE P. WOOD, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

This diversity case might have been avoided had the parties taken more pains with drafting the contract here in dispute. Dawn Equipment Company ("Dawn"), a Minnesota corporation, sold Micro–Trak Systems, Inc. ("Micro–Trak"), an Illinois

corporation, a patent for a device called a "Harvestyield," an invention designed to measure the flow of grain through a combine while "on the go" or while the combine is moving and operating. The contract specified that Dawn was to be paid at a higher rate if the patent was "suitable" and at a lower rate if it was not. After paying the higher rate for a while, Micro–Trak decided that the patent was not "suitable" and began paying the lower rate. Dawn sued for breach of contract and Micro–Trak counterclaimed. On cross motions for summary judgment, the district court found for Dawn. On the central issue, whether Micro–Trak was in breach, we reverse and remand.

## I.

Dawn, a company which develops and markets agricultural technology, developed the Harvestyield device in 1988–1993. The device is designed to monitor the amount of grain harvested, threshed, and cleaned by a combine as it harvests a field. With this technology, the clean yield harvested by the combine deflects an actuating arm at the top of the combine grain elevator. The deflection of the arm varies with the flow and is converted into an electrical signal to measure the yield. Dawn applied for a patent for the Harvestyield in September 1992, making 44 distinct claims. In June 1993, after some negotiations, Dawn signed an Asset Purchase Agreement (the "contract") with Micro–Trak, another agricultural technology firm. The contract provided, among other things, that Micro–Trak would buy the rights to the Harvestyield in exchange for a lump sum payment and a royalty payment per sale the amount of which depended upon a condition. If the Harvestyield device was issued a "suitable patent," Micro–Trak would make a royalty payment of $80 for each Harvestyield unit it sold and release $150,000 from an escrow account, but if the

patent was not suitable, Micro–Trak would owe $40 per unit sold.[1] The reason for the two-tier royalty system is that a broader patent which excluded a greater range of "on the go" yield monitors using similar technology would be more valuable.

The term "suitable patent" was defined in the contract as:

a patent covering the Harvestyield in its entirety or such significant part as to make [Micro–Trak] the exclusive producer of a device utilizing the means described in the patent application presently pending for the Harvestyield. Such a "Suitable Patent" shall include, but not necessarily be limited to, a patent issuing with any one or more of the following pending claims in the application in their current form or in a form substantially similar to their present form: 1, 2, 3, 15, 18, 19, 22, 28, 30, or 33.

These ten listed claims were among the 44 claims in the June 1992 patent application (the "initial application") and the parties agree that these claims were selected because they were the broadest of the 44 claims in the initial application.

. According to Micro–Trak, the main concern in inserting this language was to exclude a potential competitor device called the Yield Monitor 2000 ("YM2000") manufactured by Ag Leader. The YM2000 was the only "on the go" device to use technology similar to the Harvestyield with a deflecting arm sensor at the top of the combine elevator. The YM2000 was not the subject of any patent when the contract was executed or the Harvestyield patent issued. The contract does not mention the YM2000, supposedly because it was desirable that the term "suitable patent" not be defined in terms of a single competitive product. The parties had been aware of the existence of the YM2000 and the potential threat it posed to the Harvestyield patent since September 1992, shortly after Dawn filed its patent applica-

---

**1.** The page of the contract which contains the provision stating what would happen with the escrowed funds if the patent was not "suit-

able" is omitted from the record on appeal. Nothing in our decision, however, depends on that provision.

tion and well before the contract was signed, when Micro–Trak sent Dawn a copy of an Ag Leader brochure advertising the YM2000. Dawn did not disclose the existence of this brochure to the Patent and Trademark Office ("PTO") during the prosecution of the patent application. In August 1993, the PTO rejected the claims in Dawn's patent application, including the claims listed in the contract under the "suitable patent" provision, essentially because they were too broad. The examiner cited an element of a prior art patent, Strubbe, United States Patent No. 4,765,-190, as corresponding to the actuating arm of the Harvestyield claims.

Dawn amended the rejected claims in September 1993 by adding language which limited the width of the actuating arm. Claim 1 of the initial application, for example, had stated that the improvement for which a patent was sought comprised "means including an actuating arm for producing a signal indicative of a pressure being applied . . . ; and means for mounting [this] . . . so that the actuating arm intercepts clean yield product . . . ." The width of the actuating arm was not specified in the initial application beyond the statement in Claim 4 that "the actuating arm has a width, taken transversely to the direction of the flow of clean yield product . . . that is less than the total width of the flow . . . that it intercepts." The amended Claim 1 now included language reading, "said actuating arm having a dimension which is significantly less than the dimension of the elevator means." Similar language was inserted throughout the amended application. This satisfied the PTO, which issued Patent No. 5,282,389 to Dawn on February 1, 1994.

When the patent was issued, Micro–Trak released $100,000 from the escrow account and began paying at the $80 per unit-sold rate for a "suitable patent." In September 1994, the PTO issued Ag Leader a patent on the YM2000. This patent application had been filed in June 1991, 15 months before Dawn filed its Harvestyield patent application. In order to bolster a patent infringement case against Ag Leader, Micro–Trak then requested documentation from Dawn to show that the Harvestyield was invented first even though its patent application was filed second.

Among the documents Dawn provided was an advertisement Dawn had placed in the July 1991 issue of *New Farm* magazine for another Dawn product (the "Trashwheels") which, in a list of Dawn's other products, mentions the Harvestyield by name but does not describe it, although the ad does describe and depict the Trashwheels device. This ad had not been disclosed to Micro–Trak or to the PTO during the prosecution of the Harvestyield patent application. Micro–Trak expressed concern that Dawn's patent was statutorily barred because the ad constituted offering a completed invention for sale more than a year before the filing of a patent application for that invention. Micro–Trak then decided that the Harvestyield patent was not "suitable" under the contract because it could not exclude the YM2000, and accordingly reduced its royalty payments to the $40 per unit rate and refused to release the remaining funds from escrow.

Dawn sued for breach of contract in Illinois state court. After the case was removed to federal court, Micro–Trak counterclaimed under contract and quasi-contract theories based on the premise that Dawn had failed to disclose material information to the PTO as required by the applicable regulations and the contract. The district court held in December 1996 that the term "suitable patent" was not ambiguous and could only reasonably be interpreted to mean "the patent as applied for on the Harvestyield device." In January 1998, the district court granted summary judgment for Dawn, holding that the patent Dawn ultimately obtained was "in a form substantially similar in scope to the patent applied for" and so was a "suitable patent." The district court denied Micro–Trak's counterclaims, ruling that neither the Trashwheels ad nor the Ag Leader

brochure for the YM2000 was material to the Harvestyield patent application. Micro–Trak appeals.

## II.

■ Since this case involves a patent, a natural question arises about our jurisdiction. The Federal Circuit has exclusive jurisdiction over appeals from final decisions of a district court whose jurisdiction was "based, in whole or in part," on the federal monopoly on patent cases. 28 U.S.C. § 1295(a)(1) (*citing id.* § 1338(a)). The exclusive jurisdiction of the Federal Circuit, however, is limited to cases "arising under" the patent laws. For a case to "arise under" the patent laws, either federal patent law must "create[ ] the cause of action or . . . patent law [must be] a necessary element of one of the [plaintiff's] well-pleaded claims." *Christianson v. Colt Indust.*, 486 U.S. 800, 809, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988). The "arising under" analysis parallels the well-pleaded complaint rule for federal jurisdiction. *See id.*; *Kennedy v. Wright*, 851 F.2d 963, 968–969 (7th Cir.1988). If the plaintiff must succeed on a question of patent law in order to prevail, then jurisdiction is founded on § 1338, and if not, not. *Unique Concepts, Inc. v. Manuel*, 930 F.2d 573, 574 (7th Cir.1991).

■ Here Dawn need not succeed under a question of patent law but only under state contract law. Although the present case involves a patent, it turns on the construction of the term "suitable patent" in the Asset Purchase Agreement and so Dawn's well-pleaded complaint asserts a cause of action which sounds in contract. Dawn therefore properly sued for breach of contract in state court; removal jurisdiction was based on diversity of citizenship, 28 U.S.C. § 1332; and the case was correctly so treated by the district court. Accordingly we have jurisdiction under 28 U.S.C. § 1291 over this diversity contract case.

## III.

■ In a diversity case we apply federal procedural law and state substantive law. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Under federal procedure, summary judgment is appropriate where there is no genuine issue of material fact and a moving party is entitled to judgment as a matter of law. *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir.1999) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); Fed.R.Civ.P. 56(c). We review a district court's grant of summary judgment de novo, *Target Market Publishing Co. v. ADVO, Inc.*, 136 F.3d 1139, 1141 (7th Cir.1998), regarding the facts in the light most favorable to the nonmoving party and drawing every reasonable inference in favor of that party. *Talanda v. KFC National Management Co.*, 140 F.3d 1090, 1095 (7th Cir.1998).

■■ The substantive state law to be applied is specified in the contract itself as Minnesota law. Rules of contract interpretation are treated as substantive. *Bourke v. Dun & Bradstreet*, 159 F.3d 1032, 1036 (7th Cir.1998). As a court sitting in diversity, we attempt to predict how the Minnesota Supreme Court would decide the issues presented here. *Allen v. Transamerica Ins. Co.*, 128 F.3d 462, 466 (7th Cir.1997). Where the state supreme court has not ruled on an issue, decisions of the state appellate courts control, unless there are persuasive indications that the state supreme court would decide the issue differently. *Id.*

■ In Minnesota law, the interpretation of a contract is a question of law, unless there is ambiguity. *Brookfield Trade Center, Inc. v. County of Ramsey*, 584 N.W.2d 390, 394 (Minn.1998). An unambiguous agreement is to be read within the four corners of the contract. *Metropolitan Sports Facilities Comm'n v. General Mills, Inc.*, 470 N.W.2d 118, 123 (Minn.1991). Contractual language is to

be given its plain and ordinary meaning in the context of the entire contract, giving effect to all provisions of the agreement. *Current Technology Concepts, Inc. v. Irie Enterprises, Inc.*, 530 N.W.2d 539, 543 (Minn.1995). Whether a contract is ambiguous is a question of law. *Id.* A contract is ambiguous if its language is reasonably susceptible to more than one interpretation. *Id.* An ambiguous contract must be construed against its drafter. *Id.* If contractual language is ambiguous, its meaning is a question of fact and extrinsic evidence may be considered. *City of Virginia v. Northland Office Properties Limited Partnership*, 465 N.W.2d 424, 427 (Minn.Ct.App.1991); *Lake Investors Development Group, Inc. v. Egidi Development Group*, 715 F.2d 1256, 1260 (7th Cir.1983). The meaning of an ambiguous contract may be determined by the court if the extrinsic evidence is conclusive and undisputed, but if the extrinsic evidence is inconclusive or disputed, the uncertainty and conflict must be resolved at trial. *National Farmers Union Property and Casualty Co. v. Anderson*, 372 N.W.2d 71, 75 (Minn.Ct.App.1985).

■ The central issue in this case is whether the Harvestyield patent is a "suitable patent" under the contract. If it is, then Micro–Trak breached; if it is not, then Micro–Trak is home free. Whether a patent is "suitable" depends on the definition of that term in the contract, which states:

> Such a "Suitable Patent" shall include, but not necessarily be limited to, a patent issuing with any one or more of the following pending claims in the application in their current form or in a form substantially similar to their present form: 1, 2, 3, 15, 18, 19, 22, 28, 30, or 33.

The initial application referred to in the contract was rejected, but the patent issued included claims which were similar to some of the claims in the initial application—just how similar is the issue here.[2] If any one of these claims was "substantially similar" to its counterpart claim in the initial application, the patent was "suitable" under the contract. The amended language which was approved changed the language in the initial application by stating that the actuating arm of the Harvestyield has "a dimension which is *significantly* less" (emphasis added) than the dimension of the elevator. If this change merely clarifies or makes explicit the claims in the initial application, then the claims approved are "substantially similar" to those initially applied for. If, however, the amended language narrows those claims substantially, the claims in the patent are not substantially similar to those in the initial application. The expression "substantially similar," like "suitable patent" is a term of the contract and not of patent law.

The contract is ambiguous because it will bear more than one reasonable interpretation. Whether the amended claims stating that the dimension of the Harvestyield actuating arm is "significantly less" than that of the elevator are "substantially similar" to the initial claims depends on whether the initial claims called for an actuating arm of such relative size. One claim in the initial application which expressly addressed the dimension of the actuating arm is Claim 4, which states that "the actuating arm has a width, taken transversely to the direction of the flow of clean yield product ... that is less than the total width of the flow ... that it intercepts." This language could reasonably be interpreted, with Dawn, to mean that the actuating arm had to have a dimension "significantly less" than the di-

**2.** Micro–Trak says its motivation in including the "suitable patent" language was to exclude the YM2000 and that it decided to begin paying at the lower rate when it determined that the Harvestyield patent would not exclude the YM2000. However, the contract does not mention the YM2000 or make its exclusion a condition of suitability, so we do not consider issues concerning the YM2000 in construing the contract within its four corners.

mension of the elevator, in which case the amending language merely makes explicit what is already implicit in that claim, as the district court concluded. But it might also reasonably be interpreted, with Micro–Trak, to mean that the width of the actuating arm is less, but not necessarily *significantly* less, than the width of elevator. Whether the word "significantly" admits or prevents "substantial similarity" cannot be read off the language.

Moreover, it is not clear from the contract whether the language of Claim 4 is even to be taken into account in determining whether the claims in the patent issued are "substantially similar" to those initially applied for. Claim 4, where the relative width of the two parts is treated, is not among the ten claims that the contract expressly lists as relevant for establishing substantial similarity. This is consistent with Micro–Trak's argument that Claim 4 was deliberately excluded from consideration of whether a patent was issued in a form that was "substantially similar" to the initial application. However, the contract also says that a suitable patent "shall include, but not necessarily be limited to" a patent issued with claims substantially similar to the ten listed claims. This language might reasonably be read to allow reference to Claim 4 for these purposes, although, as noted, even if Claim 4 is one of the relevant nonlisted claims, it does not settle the matter one way or the other.

The parties each argue that the issue can be resolved decisively in its own favor purely as a matter of law. Micro–Trak cites Federal Circuit precedent for the proposition that the "scope" of a patent reissued with added words to avoid infringement of prior art patents is not "without substantial change" as compared to the scope of the original claims in a patent. *See Seattle Box Co. v. Industrial Crating & Packing, Inc.*, 731 F.2d 818, 828 (Fed. Cir.1984); *Bloom Eng'ring Co. v. North American Mfg. Co.*, 129 F.3d 1247, 1250–51 (Fed.Cir.1997). Micro–Trak contends that the analogy applies because, although

there was no re-issue, Dawn nonetheless amended the language of the application to distinguish the invention from prior art. Dawn responds with Federal Circuit and other caselaw supporting the proposition that a clarificatory amendment that states expressly what was implicit in the initial language does not affect the scope of the claim. *See, e.g., Bloom Eng'ring*, 129 F.3d at 1250. The parties disagree over several other issues of patent law as well.

This case, however, does not concern the scope of a claim in a patent. That is an issue in patent law not referred to in the contract, which does not use the expression "within the scope." The question presented here is one of contractual interpretation: whether a patent issued with a claim in a form "substantially similar" to some claims on a specified list, but not necessarily limited to that list. As noted, the contract gives no univocal answer on its face. The patent law cases at best provide analogies which might or might not illuminate whether there was "substantial similarity" under the contract, but in the absence of clear textual evidence in the contract that the parties intended that patent law govern the determination of that issue, we will not read it into the contract. Had the parties wished to invoke patent law, they had ample opportunity to do so in the written agreement, just as they had ample opportunity to explain in plain English what it was they meant by a "suitable patent"—for example, one that excluded the YM2000, if that was what they wanted to do. If they failed to do so, the fault is entirely their own. *See Bourke*, 159 F.3d at 1037 ("This is not fine prose nor … terribly clear. It would appear to have been drafted by lawyers.").

 Since the contract is ambiguous, Minnesota contract law directs a court to consider extrinsic evidence to determine the intention of the parties from the surrounding circumstances and the parties'

own subsequent conduct.[3] *Emerick v. Sanchez,* 547 N.W.2d 109, 112 (Minn.Ct. App.1996); *Fredrich v. Independent School District No. 720,* 465 N.W.2d 692, 695 (Minn.Ct.App.1991). The facts that Micro–Trak paid Dawn the higher "suitable patent" rate for 15 months or that concerns about the YM2000 played a role in the adoption of the ambiguous language may be relevant or they may not be. Whether the extrinsic evidence is "conclusive and undisputed," allowing the ambiguity to be resolved as a matter of law or "inconclusive or disputed," requiring a trial, see *National Farmers Union Property and Casualty Co.,* 372 N.W.2d at 75, an appeals court is not in the best position to determine. The district court should conduct an evidentiary hearing, inquiring into the nature and import of the extrinsic evidence bearing on the intention of the parties, to determine whether the contract can be construed without a trial.

IV.

Micro–Trak argues further that the district court erred with respect to its determinations as to the legal significance, or lack of it, of Dawn's Trashwheels ad, which mentioned the Harvestyield device, and of the Ag Leader YM2000 brochure. Micro–Trak had counterclaimed for breach of contract and under related theories on the grounds that the contract required these items to be disclosed to the PTO as "material" to the patentability of the Harvestyield in compliance with applicable regulations. *See* 37 C.F.R. § 1.56(a) ("duty to disclose ... all information known ... to be material to patentability"). It is undisputed that the items were not disclosed. Micro–Trak argues that they were "material" and that Dawn was therefore in breach.

 Micro–Trak says that the Trashwheels ad, with its single-word, unillustrated use of the term "Harvestyield" in the context of a rich, detailed description of the Trashwheels accompanied by pictures, was material because it triggered the statutory bar against obtaining a patent if the invention was "on sale" more than one year before the patent application was filed. *See* 35 U.S.C. § 102(b). A claimed invention is considered to be "on sale" if, more than one year before the filing date, (1) the product is the subject of a commercial offer for sale, and (2) the invention is ready for patenting. *Pfaff v. Wells Electronics, Inc.,* 525 U.S. 55, 119 S.Ct. 304, 312, 142 L.Ed.2d 261 (1998). The Trashwheels ad, according to Micro–Trak, was placed with commercial intent and so put the Harvestyield "on sale."

 Micro–Trak, however, fails to argue that in July 1991, when the ad was published, the Harvestyield was in any sense "ready for patenting," a necessary element in lowering the "on-sale" bar. That point is therefore waived. *See Kauthar SDN BHD v. Sternberg,* 149 F.3d 659, 667 (7th Cir.1998). Moreover, while being "on sale" does not require an actual sale but only "activity by the inventor or his company in attempting to sell the patented idea," *National Business Systems, Inc. v. AM Intern'l, Inc.,* 743 F.2d 1227, 1236 (7th Cir.1984), Micro–Trak does not carry its burden that the Trashwheels ad involved

---

**3.** The principle that ambiguity should be construed against the drafter does not control because we deal with a negotiated contract between sophisticated commercial clients "advised by counsel and having equal bargaining power." *See Northbrook Excess and Surplus Insurance Co. v. Procter & Gamble Co.,* 924 F.2d 633, 639 n. 6 (7th Cir.1991); *see also, e.g., Untiedt v. Grand Laboratories, Inc.,* 552 N.W.2d 571, 574 (Minn.Ct.App.1996); *Cardenas v. Ramsey County,* 322 N.W.2d 191, 193–94 (Minn.1982). The Eighth Circuit, in-

terpreting Minnesota law, suggests that the application of the principle may be restricted to contracts of adhesion, *see Landro v. Glendenning Motorways, Inc.,* 625 F.2d 1344, 1354 (8th Cir.1980), and we normally defer to a sister circuit's interpretation of the law of a state within its jurisdiction. *See Factors Etc., Inc. v. Pro Arts, Inc.,* 652 F.2d 278, 283 (2d Cir.1981). Even were we to apply the principle, under Minnesota law, it is not a trump. *See Benson v. City of Little Falls,* 379 N.W.2d 711, 713 (Minn.Ct.App.1986).

such activity. The ad was clearly not for for the Harvestyield but for the Trashwheels, which it depicted and described. The ad contained a solitary mention of the Harvestyield, listed along with a number of other Dawn products. A reader could not glean from the ad what a Harvestyield was apart from the context indicating that it was some sort of agricultural equipment. There was no price or any other term or condition of sale or anything indicating that or when the device would be available. The mention of the Harvestyield in this context was at most a part of an advertisement for Dawn, to indicate the company's range. The district court was correct to conclude that the Trashwheels ad was not material.

■ The YM2000 brochure, Micro–Trak contends, should have been disclosed to the PTO as material because the YM2000 was similar to the Harvestyield in having a sensor mounted at the top of the clean grain elevator and because President Bassett of Dawn expressed concern that the YM2000 was "very similar" to the Harvestyield and may have infringed the Harvestyield patent as issued. Even taking the facts in the light most favorable to Micro–Trak, the Ag Leader brochure focused on the in-cab display and did not explain the design of the YM2000 or contain information which might be helpful to the patent examiner in determining whether it was prior art. The fact that Bassett had concerns about information which might have been material with respect to the YM2000 does not mean that he had knowledge, and it is only information *known* to be material which must be disclosed. *See* 37 C.F.R. § 1.56(a); in any case, whatever Bassett knew, it could not have been based on the YM2000 brochure, which contains nothing material. Because the brochure is the only issue Micro–Trak raises regarding disclosure pertinent to the YM2000, we need not discuss the significance of the PTO's failure to find that the YM2000 was prior art to the Harvestyield, something that Dawn urges as a basis

for affirmance on this issue. The district court was correct that Micro–Trak's counterclaims will not hold water.

We AFFIRM the grant of summary judgment on MicroTrak's counterclaims; with respect to the grant of summary judgment on Dawn's breach of contract claim, however, we REVERSE and REMAND for further proceedings consistent with this opinion.