Joel BLAZ and Frances
Lauer, Plaintiffs,

v.

MICHAEL REESE HOSPITAL FOUNDATION dba Michael Reese Hospital and Medical Center, and Arthur B. Schneider, M.D., Defendants.

No. 96 C 0091.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 10, 1999.

Martin H. Freeman, Barbara E. Hirsch, Freeman & Jenner, P.C., Rockville, MD, E. Cooper Brown, H.W. Cummins, Cummins & Brown, Takoma Park, MD, for Joel Blaz.

Marvin A. Brustin, Ltd., Chicago, IL, for Frances Lauer.

Michael J. Morrissey, Julie Ann Teuscher, Cassiday, Schade & Gloor, Chicago, IL, Charles R. Krikorian, Welsh & Katz, Ltd., Chicago, IL, for Galen Hospital.

Williams P. Dorr, Hugh L. Moore, David C. Hall, Jason Ayres Parson, David Craig Hall, William Andrew Rakoczy, Lord, Bissell & Brook, Chicago, IL, for Arthur B. Schneider, MD.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

Is there a duty to warn the subject of radiation treatments when a physician in charge of a hospital research program created to investigate the risks of its previous radiation treatment policies uncovers in his research a strong connection between those treatments and certain sorts of tumors? Here the physician contends that he had no duty to warn because he was not the subject's treating physician. I conclude that Illinois law does not support his argument and that he had a duty to warn.

### I.

About 5,000 patients at Michael Reese Hospital and Medical Center ("Michael Reese"), located in Chicago, Illinois, were treated with X-ray therapy for some benign conditions of the head and neck from 1930 to 1960. Among them was Joel Blaz, now a citizen of Florida, who received this treatment for infected tonsils and adenoids while a child in Illinois in 1947–48. He has suffered various tumors which he now attributes to this treatment. Blaz was diagnosed with a neural tumor in 1987.

In 1974, Michael Reese set up a Thyroid Follow–Up Project (the "Program") to gather data and conduct research among the people who had been subjected to the x-ray therapy. In 1975, the Program notified Blaz by mail that he was at increased risk of developing thyroid tumors because of the treatment. In 1976, someone associated with the Program gave him similar information by phone and invited him to return to Michael Reese for evaluation and treatment at his own expense, which he declined to do.

Dr. Arthur Schneider was put in charge of the Program in 1977. In 1979, Dr. Schneider and Michael Reese submitted a research proposal to the National Institutes for Health ("NIH") stating that a study based on the Program showed "strong evidence" of a connection between x-ray treatments of the sort administered to Blaz and various sorts of tumors, thyroid, neural, and other. In 1981, Blaz received but did not complete or return a questionnaire attached to a letter from Dr. Schneider in connection with the Program. The letter stated that the purpose of the questionnaire was to "investigate the long term health implications" of childhood radiation treatments and to "determine the possible associated risks." It did not say anything about "strong evidence" of a connection between the treatments and any tumors.

In 1996, after developing neural tumors, Blaz sued Michael Reese's successor, Galen Hospital, Illinois, and Dr. Schneider, alleging, among other things, that they failed to notify and warn him of their findings that he might be at greater risk of neural tumors in a way that might have permitted their earlier detection and removal or other treatment. Much litigation ensued, including this motion to dismiss Dr. Schneider from the action, which I now consider.[1]

---

1. Dr. Schneider presented this as a motion for summary judgment and then as a motion

for clarification of my ruling on that motion. I decided to treat the motion as a motion to

## II.

This is a diversity case, so I apply state substantive and federal procedural law. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In a motion to dismiss under either Fed. R.Civ.P. 12(b)(6) or Rule 12(c), I accept the well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Gastineau v. Fleet Mortgage Corp.,* 137 F.3d 490, 493 (7th Cir.1998). Such motions "should not be granted unless it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Hentosh v. Herman M. Finch Univ. of Health Sciences/The Chicago Med. School,* 167 F.3d 1170, 1173 (7th Cir.1999) (*citing Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

 A federal court sitting in diversity must attempt to predict how the state supreme court would decide the issues presented here. *Dawn Equipment Co. v. Micro–Trak Sys., Inc.,* 186 F.3d 981, 986 (7th Cir.1999). I apply Illinois law because the governing substantive law is undisputed. *Grundstad v. Ritt,* 166 F.3d 867, 870 (7th Cir.1999). In Illinois, a complaint for negligence must establish the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach. *Kirk v. Michael Reese Hosp.,* 117 Ill.2d 507, 111 Ill.Dec. 944, 513 N.E.2d 387, 395–96 (1987). Whether a duty exists— "whether the defendant and the plaintiff stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff"—is an issue of law to be determined by the court. *Id.* at 396.

 The question here is whether a physician who directed a hospital research project inquiring into the risks of treatments the hospital formerly administered has a duty to warn a patient whom he never treated of the risks attendant on those treatments. No Illinois cases speak directly to this question, but the general criteria for the existence of a legal duty established by the Illinois Supreme Court are: (1) "whether the harm reasonably was foreseeable," *Kirk v. Michael Reese Hosp.* 111 Ill.Dec. 944, 513 N.E.2d at 396 (medical context), as well as the factors identified long ago by Judge Learned Hand:[2] (2) the likelihood of injury, (3) the magnitude of the burden of guarding against it, and (4) the consequences of placing that burden upon the defendant. *Id.* A duty to warn exists when there is "unequal knowledge and the defendant, possessed of such knowledge, knows or should know that harm might occur if no warning is given." *Kokoyachuk v. Aeroquip Corp.,* 172 Ill.App.3d 432, 122 Ill.Dec. 348, 526 N.E.2d 607, 610 (1988).

Under this framework, it is clear that a duty to warn exists. The harm alleged here, neural and other tumors, would here be reasonably foreseeable as a likely consequence of a failure to warn, and was in fact foreseen by Dr. Schneider. A reasonable physician, indeed any reasonable person, could foresee that if someone were warned of "strong evidence" of a connection between treatments to which he had been subjected and tumors, he would probably seek diagnosis or treatment and perhaps avoid these tumors, and if he were not warned he probably would not seek diagnosis or treatment, increasing the likelihood that he would suffer from such tumors. Other things being equal, therefore, a reasonable physician would warn the subject of the treatments.

Moreover, other things are indeed equal. The likelihood of injury is hard to calculate in this case, but even supposing that it was small, the burden on the defendant was negligible, since Dr. Schneider was already

---

dismiss for failure to state a claim, Rule 12(b)(6), or for judgment on the pleadings, Rule 12(c), and so analyze it here.

**2.** *See United States v. Carroll Towing Co.,* 159 F.2d 169, 173 (2d Cir.1947) (stating the "Hand Formula").

in communication with Mr. Blaz and might easily have informed him in the 1981 letter, if not sooner,. of the same things he had told the NIH. Moreover, placing the burden on the defendant rather than the plaintiff is the only decision that makes sense, since Dr. Schneider was in a special position to acquire the information and had in fact done so, while Mr. Blaz was in no position to find out. *See Kokoyachuk,* 122 Ill.Dec. 348, 526 N.E.2d at 610.

As I have stated in a previous opinion, this case is analogous to *Mink v. Univ. of Chicago,* 460 F.Supp. 713 (N.D.Ill.1978). There physicians in a university hospital administered DES, a drug which was intended to prevent miscarriages but which was alleged to cause cervical cancer and other illnesses in the children. The defendants there made no effort to contact or warn the patients or their children for at least five years after the risk was generally known to the medical community, and then only suggested the risk in the blandest possible terms. *Id.* at 715. The district court concluded that the defendants, both physicians and the hospital, "had a duty to notify the plaintiff patients of the risks inherent in DES treatment when they became aware, or should have become aware of the relationship between DES and cancer." *Id.* at 720. It does not "alter the obligation" that the risks became known "after the patient was treated." *Id.* I have concluded that if this case were presented to the Illinois Supreme Court, it would apply *Mink* and reach the same result here, that there exists a duty to warn.

Dr. Schneider and Michael Reese argue to the contrary from the fact that Dr. Schneider, unlike the physicians involved in *Mink,* was never Mr. Blaz's physician, so no physician-patient relationship with its attendant legal responsibilities ever existed between them. However, Dr. Schneider had the duty to warn in virtue of his role as the physician in charge of the hospital's Program. He was not Mr. Blaz's treating physician, but he was the physician designated by Michael Reese to direct the Program which was responsible for researching the effects of the radiation treatment and communicating with the hospital's former patients in regard to those treatments. "A modern hospital ... is an amalgam of many individuals .... Moreover, it is clear that at times a hospital functions far beyond the narrow sphere of medical practice." *Pitler v. Michael Reese Hosp.,* 92 Ill.App.3d 739, 47 Ill.Dec. 942, 415 N.E.2d 1255, 1259 (1980) (finding a duty to warn in a radiation treatment case). Researching the effects of previous treatment policies is among the ways · a hospital functions beyond medical practice narrowly understood. The agent to whom the hospital delegates the direction of such research has an obligation to inform the patients subjected to such treatments of the results of that research if it indicates that there is a foreseeable risk.

Dr. Schneider and Michael Reese object that he had no such duty because, since he was not the treating physician, he did not create the risk to which Mr. Blaz was exposed. This argument is not to the point. First, Dr. Schneider's duty was complementary to the hospital's duty to its patients, regardless of who treated them, to conform to the legal standard of reasonable conduct in light of the apparent risk. *Magana v. Elie,* 108 Ill.App.3d 1028, 64 Ill.Dec. 511, 439 N.E.2d 1319, 1321 (1982). Under *Magana,* the hospital may have had a duty to require Dr. Schneider to warn Mr. Blaz of the risks, *see Tobias v. Winkler,* 156 Ill.App.3d 886, 109 Ill.Dec. 211, 509 N.E.2d 1050, 1055–56 (1987), but because "it is within the doctor's discretion to determine what to disclose to a patient in a particular situation," *id.,* Dr. Schneider had a duty to actually warn Mr. Blaz.

Second, I hold that Dr. Schneider's position as the person in charge of the Program involved in researching the effects of the radiation treatments and contacting patients who had been subjected to them created the sort of "special relationship" the Illinois Supreme Court requires for a

finding of duty in the absence of a physician-patient relationship. *Kirk,* 111 Ill. Dec. 944, 513 N.E.2d at 399. While that Court has been reluctant to expand the scope of tort liability, it has also eschewed a mechanical and formalistic approach to determinations of duty, stating that " 'duty' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." *Renslow v. Mennonite Hosp.,* 67 Ill.2d 348, 10 Ill.Dec. 484, 367 N.E.2d 1250, 1254 (1977) (*citing* Prosser, *Prosser on Torts* § 53, at 325–26 (4th ed.1971)).[3]

In determining whether a duty exists, the Illinois Supreme Court sensibly conducts a policy analysis rather than applying a cookie cutter. In *Kirk,* that Court rejected a "broad duty extended to the general public [which] would expand the physician's duty of care to an indeterminate class of potential plaintiffs." 111 Ill. Dec. 944, 513 N.E.2d at 399. The rule proposed here would not raise that concern, since the potential class of plaintiffs is the well-defined list of former hospital patients who were subjected to the radiation treatments whose effects were studied in the Program.

The only policy concern I can see here is that it might be thought to inhibit research into the effects of medical treatment if nontreating physicians in charge of such research programs are held to have a duty to warn the former patients of risks discovered in that research. But this does not strike me as a real worry. First, the duty would be discharged by a mere warning which, as explained, would here have been neither costly nor burdensome to give. The more costly and burdensome the warning would be to give, of course, the less likely there would be a finding of duty. Second, the medical researchers' legitimate desire for professional prestige and honor due to new discoveries, *see generally* Robert K. Merton, *The Sociology of Science* (1973), would counteract any such inhibition; as of course would the concern for the well-being of its former patients which any self-respecting hospital would have.

Against this rather nebulous and unsubstantial worry I must balance the fact that a finding of no duty would allow physicians in charge of hospital research programs into the risks of treatment policies to exploit the results of that research for their professional advancement and curiosity without warning the patients of any risks connected with those treatments which their research discovered, however little the cost of warning. I can see no social benefit in creating such a perverse incentive structure, particularly in view of the costs to the patients and society of preventable tumors and other illnesses. Preventative care is not an overriding good, but it is a considerable one.

The long and short of it is that Dr. Schneider, in virtue of his position, was not entitled to use the information he had acquired about the risk to former patients for his own professional advancement without warning them of the risks which his own research had suggested that the hospital's treatments had created for them. His motion to dismiss is therefore DE-NIED.

---

**3.** The Restatement of Torts leaves open the possibility of there being "other relations" than the traditional ones (which, indeed, do not include the physician-patient relationship) "which impose a similar duty," commenting that "the relations listed are not intended to be exclusive," and stating that "the law appears to be working ... towards a recognition of the duty to aid or protect in any relation of dependence ...." 2 Restatement (Second) of Torts § 314, caveat & cmt. b, at 119.