**BROOKFIELD TRADE CENTER, INC. and Petula Associates, Ltd., Respondents,**

v.

**COUNTY OF RAMSEY, Relator.**

No. C1–97–2171.

Supreme Court of Minnesota.

Aug. 13, 1998.

Rehearing Denied Oct. 9, 1998.

Susan Gaertner, Ramsey County Atty., M. Jean Stepan, Asst. County Atty., St. Paul, for relator.

Thomas R. Wilhelmy, Laurie J. Miller, Fredrikson & Byron, P.A., Minneapolis, for respondents.

Carla J. Heyl, St. Paul, for amicus curiae League of Minnesota Cities.

Peg Birk, City Atty., Peter J. McCall, Asst. City Atty., St. Paul, David F. Herr, Wayne S. Moskowitz, Maslon Edelman Borman & Brand, L.L.P., Minneapolis, for amici curiae City of St. Paul and HRA of City of St. Paul.

## OPINION

PAUL H. ANDERSON, Justice.

In a grant of summary judgment in favor of respondents Brookfield Trade Center, Inc. and Petula Associates, Ltd., the Minnesota Tax Court held that the January 2, 1993 real estate tax valuation for the Minnesota World Trade Center must be recalculated so as to reflect the Trade Center's actual fair market value on that date. The tax court rejected relator County of Ramsey's argument that the minimum market value established in an assessment agreement executed as part of a tax increment financing development agreement was the correct basis for determining the Trade Center's 1993 valuation. In arriving at its holding, the tax court interpreted language in the assessment agreement providing that the minimum market value established in the agreement "shall be of no further force and effect" after the agreement's termination as eliminating the effect of the minimum market value on taxes payable after the termination of the assessment agreement and, implicitly, the valuations on which these taxes were based. We conclude that the tax court's interpretation of the assessment agreement is contrary to the plain language of the assessment agreement and the scheme of Minnesota's real estate tax laws. Therefore, we reverse the decision of the tax court and remand for determination of the remaining issue of whether the assessor's

certification of the assessment agreement met statutory requirements.

In July 1985, the City of St. Paul and its Housing & Redevelopment Authority entered into a development agreement with Oxford Development Minnesota, Inc. to build the Minnesota World Trade Center. The agreement provided that the city would issue tax increment financing (TIF) bonds to finance the construction of the Trade Center. In conjunction with this development agreement, Oxford and the city entered into the assessment agreement at issue in this case.

The assessment agreement, dated July 2, 1985, set the Trade Center's minimum market value for real estate tax purposes at $1,800,000 on January 2, 1986, $10,827,401 on January 2, 1987, and $43,309,606 on January 2, 1988, and on each January 2 valuation date thereafter during the course of the agreement. The agreement provided for its own termination upon the happening of the earliest of four listed events, one of which was the retirement or discharge of the TIF bonds. Specifically, the agreement provided that, upon the happening of a listed event, "[t]he minimum market value herein established shall be of no further force and effect and this Agreement shall terminate[.]"

The Trade Center's real estate tax revenue was to be used to pay the interest and principal on the TIF bonds. The TIF bonds were projected to be paid off in full on February 1, 1993. The last payment on the bonds was to be made with funds received from the payment of the second one-half of the 1992 real estate taxes, payment of which was to be made in October 1992. As projected, real estate taxes due and payable in 1992 and all prior years were paid in full and the city retired the bonds on February 1, 1993. Retirement of the bonds, one of the listed events in the assessment agreement, triggered the agreement's termination.

On May 16, 1994, Brookfield and Petula, Oxford's successors in interest, filed a petition for review of the Trade Center's real estate taxes due and payable in 1994 and the January 2, 1993 assessment upon which these taxes were based. The petition requested that the tax court reduce the Trade Center's

January 2, 1993 assessed value to reflect its actual fair market value. Brookfield and Petula sought this relief because they believed that the Trade Center's actual fair market value on that date was substantially less than the minimum market value established in the assessment agreement.

Following discovery, Brookfield and Petula filed a motion for summary judgment on four grounds: 1) under the assessment agreement's plain language, the minimum market value established in the agreement had no force or effect upon real estate tax proceedings commenced after the agreement terminated; 2) the parties intended the effect of the minimum market value established in the agreement to terminate after determination of the January 2, 1991 assessed value and payment of the 1992 real estate taxes that were based upon this assessed value; 3) the governing statute, Minn.Stat. § 273.76 (1984), authorized them to seek a reduction; and 4) the assessment agreement was unenforceable because the assessor's certification failed to comply with statutory requirements.

Relator Ramsey County filed a cross-motion for summary judgment on the ground that the tax court was barred from considering the effect of the termination of the assessment agreement on the assessed value because the termination occurred on February 1, 1993, nearly a month after the January 2, 1993 valuation date.

■ The tax court granted Brookfield and Petula's motion for summary judgment, holding that the minimum market value established in the assessment agreement did not control taxes payable after the termination of the assessment agreement on February 1, 1993 or the valuation dates on which these taxes were based. Therefore, the court concluded that the agreement did not control

taxes due and payable in 1994 or the Trade Center's January 2, 1993 assessed value on which these taxes were based. Accordingly, the court went on to conclude that the January 2, 1993 assessed value should be retroactively changed to reflect the Trade Center's actual fair market value. The tax court based this holding on its interpretation of the following clause in the agreement: "[t]he minimum market value herein established shall be of no further force and effect and this Agreement shall terminate[.]" The court determined that in order to give the clause "of no further force and effect" a reasonable and effective meaning apart from the language indicating that the agreement would terminate, this clause must eliminate any legal consequences of the agreement's minimum market value after the retirement of the TIF bonds on February 1, 1993, including its effect on real estate taxes due and payable after that date. The tax court then went on to hold that as the agreement did not control the real estate taxes due and payable in 1994, the assessment agreement had no force and effect in determining the Trade Center's assessed value on the January 2, 1993 valuation date on which those taxes were based.[1] Additionally, the tax court found that this holding was consistent with the parties' intent to use the agreement's minimum market value as a means to ensure that there would be sufficient taxes to repay the TIF bonds used to finance the Trade Center. The tax court then ordered the remaining issue of the fair market value of the Trade Center as of January 2, 1993 to be scheduled for trial. Ramsey County now seeks review of the tax court's decision.

■ In reviewing a summary judgment motion, we determine whether there are any genuine issues of material fact and whether the lower court erred in its application of the

1. Because the tax court held that the assessment agreement does not apply to any taxes payable after retirement of the bonds on February 1, 1993, it put into question the assessed value of the Trade Center as of January 2, 1992 and real estate taxes due and payable in 1993. However, because Brookfield and Petula acknowledge that they did not file a petition to contest this assessment, the issue of the proper value of the Trade Center on January 2, 1992 is not before the court and we make no holding on it. Likewise, we will

not consider Brookfield and Petula's failure to contest this assessment as evidence of their understanding of the meaning of the agreement as not effecting taxes assessed according to the minimum market value prior to the retirement of the bonds, but payable after that event, as urged by Ramsey County. We have determined that the contract is unambiguous and, therefore, we may not consider extrinsic evidence of the parties' intent.

law. *L & H Transp., Inc. v. Drew Agency, Inc.*, 403 N.W.2d 223, 227 (Minn.1987). We review de novo the tax court's conclusions of law, including the interpretation of relevant statutes. *F–D Oil Co., Inc. v. Commissioner of Revenue*, 560 N.W.2d 701, 704 (Minn.1997).

■ As an initial matter, we note that the tax court's order did not determine the entire controversy and, therefore, is not properly before us pursuant to Minn.Stat. § 271.10, subd. 1 (1996). However, we may permit discretionary review of such an order pursuant to our inherent powers and in the interests of justice. *See Tarutis v. Commissioner of Revenue*, 393 N.W.2d 667, 669 (Minn.1986). We conclude that it is in the interests of justice and, particularly, in the interest of judicial economy to review this matter now.

In interpreting the Trade Center's assessment agreement, it is important to understand the basic contours of Minnesota's real estate tax system and the TIF laws that authorize such an agreement. A fundamental element of our real estate tax system is a uniform valuation date when the annual value of all real property is determined. Minnesota Statutes section 273.01 (1996) provides that "[a]ll real property subject to taxation shall be listed * * * with reference to their value on January 2 preceding the assessment." Hence, real property values are established in accordance with the property's value on the January 2 preceding the assessment, irrespective of events occurring after January 2 that may change the value of the property. We confirmed this principle in *Stoltzmann v. County of Ramsey*, where we held that, when setting the fair market value of the petitioner's home for real estate tax purposes, the assessor was prohibited from considering the fact that the home was destroyed by fire approximately four months after the valuation date. 312 Minn. 186, 187, 190–91, 251 N.W.2d 130, 131, 133–34 (1977). We reasoned that to hold otherwise "would require the continual revaluation of all real property in order to obtain a completely accurate and up-to-date assessment." *Id.* at

191, 251 N.W.2d at 134. While we recognized the potential unfairness of such a uniform rule, we noted that "periodical assessments, if they produce injustice in one case, may correct it in the next, and on the whole are likely to be fair. At any rate, they constitute the best regulation the law can establish." *Id.* at 193, 251 N.W.2d at 134 (quoting 3 Cooley, Taxation (4 ed.), § 1062, p. 2140).

When the legislature has intended that a property's assessed value reflect changes in the status of property occurring after the January 2 valuation date, it has provided specific statutory authorization. For example, Minn.Stat. § 272.02, subd. 4(a) (1996) requires exempt property that loses its exempt status before July 1 of any year to be placed on the assessment rolls and valued as of January 2 of that year. Conversely, property subject to tax on January 2 that is subsequently acquired for specified exempt purposes prior to July 1 can qualify for exemption for that year. Minn.Stat. § 272.02, subd. 4(b) (Supp.1997). Similarly, the legislature has authorized a specific exception to the uniform valuation date for changes in homestead status. The assessor must grant homestead treatment to a property that was not used as a homestead on the January 2 valuation date, but which was subsequently used as a homestead by December 1 of that same year. Minn.Stat. § 273.124, subd. 9 (1996).[2]

Another basic principle of the tax system is that real property must be valued at its fair market value. Minn.Stat. § 273.11, subd. 1 (1996). However, the legislature has created an exception to this rule for assessment agreements within the TIF laws. These assessment agreements facilitate economic development through tax increment financing by ensuring that the property subject to the agreement will generate the amount of tax revenue necessary to pay for the TIF bonds. This is done by establishing a minimum market value below which the

---

**2.** Additionally, we note that the legislature has created a similar exception for modifications made to assessment agreements. The statute provides that in order for a change to an assessment agreement to be effective for an assessment year, it must be fully executed before July 1. Minn.Stat. § 469.177, subd. 8 (1996). However, this provision does not apply to the assessment agreement at hand because it was not modified, but terminated according to its original terms.

property may not be valued. Minn.Stat. § 469.177, subd. 8 (1996).

Tax increment financing is a tool used by cities and other development authorities to finance the development or redevelopment of a particular geographic or project area. Minn.Stat. §§ 469.174–79 (1996). It operates by enabling the city or authority to capture the additional real estate tax revenue or tax increments generated by a new development instead of allowing these tax increments to go to other taxing jurisdictions such as the county or the local school district. Minn. Stat. § 469.176, subd. 4. The city or authority then uses these tax increments to finance the cost of the development. *Id.* A project area that is to be developed may be divided into separate districts from which the tax increment will be derived. Minn.Stat. § 469.174, subd. 9. While the bulk of the tax increment revenues must be spent in the particular district that generated the revenues, up to twenty to twenty-five percent of the tax revenue generated by a particular district may be spent elsewhere within other districts in the project area. Minn.Stat. § 469.1763, subd. 2(a).

It is within the context of this tax system and the TIF laws that we examine the assessment agreement for the Trade Center. The agreement set the minimum market value for the Trade Center at $43,309,606 on the January 2, 1988 valuation date and for each valuation date thereafter during the course of the agreement. The termination of the assessment agreement was premised on the happening of the earliest of one of four listed events, including the retirement or discharge of the TIF bonds. Upon that occurrence, the agreement provided that "the minimum market value herein established shall be of no further force and effect and this Agreement shall terminate." We must now interpret the meaning and effect of this language.

 The construction and effect of a contract presents a question of law, unless an ambiguity exists. *Trondson v. Janikula,* 458 N.W.2d 679, 681 (Minn.1990). A contract is ambiguous if its language is reasonably susceptible to more than one interpretation. *Current Tech. Concepts, Inc. v. Irie Enterprises, Inc.,* 530 N.W.2d 539, 543 (Minn.

1995). In interpreting a contract, the language is to be given its plain and ordinary meaning. *Employers Mut. Liab. Ins. Co. v. Eagles Lodge,* 282 Minn. 477, 479, 165 N.W.2d 554, 556 (1969). We read contract terms in the context of the entire contract and will not construe the terms so as to lead to a harsh and absurd result. *Id.* Additionally, we are to interpret a contract in such a way, as to give meaning to all of its provisions. *Current Tech. Concepts, Inc.,* 530 N.W.2d at 543.

 We conclude that the language of the termination provision at issue in the assessment agreement is clear and unambiguous. It provides that the agreement shall terminate. The plain meaning of the language providing that "[t]he minimum market value herein established shall be of no further force and effect" is also clear. Its purpose is to eliminate any legal effect of the minimum market value established by the agreement on determinations of assessed value occurring after the agreement has been terminated. The word "further" indicates that the clause has prospective application to assessment valuations. In addition, our long-established case law mandates this interpretation. We have held that it is a basic principle of real property taxation that events subsequent to the valuation date of property have no bearing on the valuation set on that date. *See Stoltzmann,* 312 Minn. at 190–93, 251 N.W.2d at 133–35; *Martin County v. Drake,* 40 Minn. 137, 138–39, 41 N.W. 942, 942–43 (1889). The tax court's interpretation of the clause as eliminating the effect of the agreement's minimum market value on taxes *payable* after the retirement of the TIF bonds on February 1, 1993 violates this principle. The tax court's interpretation requires a retroactive change to the Trade Center's assessed value on the January 2, 1993 valuation date based on an event occurring after that date, i.e., the retirement of the tax increment financing bonds.

Moreover, contrary to the argument made by Brookfield and Petula, our interpretation of the agreement's language provides meaning to both the clause providing that the agreement shall terminate and the clause providing that the minimum market value

"shall be of no further force and effect." The clause terminating the agreement ends the contractual obligation to use the minimum market value to establish the value of the Trade Center, while the "no further force and effect" clause emphasizes that the minimum market value may not be given any other legal effect on determinations of assessed value after the agreement has been terminated. For example, the agreement's minimum market value may not be used as a legal presumption of the value of the Trade Center.

Finally, we refute the tax court's reasoning that eliminating the effect of the minimum market value on taxes payable after the retirement of the TIF bonds effectuates the parties' intent to use the minimum market value to ensure that there would be sufficient revenue to pay off the bonds. The bonds were projected to be paid off in full on February 1, 1993 with funds received from the payment of the second one-half of the 1992 real estate taxes on the Trade Center, which were due and payable in October 1992. Had the parties intended that the agreement's minimum market value cease being in effect once sufficient value was assessed to the property to pay the TIF bonds, they could have provided that the minimum market value would not apply after the January 2, 1991 valuation date. The parties did not do so and this court will not now strain the language of the agreement to arrive at this result. *See Carl Bolander & Sons, Inc. v. United Stockyards Corp.*, 298 Minn. 428, 433, 215 N.W.2d 473, 476 (1974) (stating that this court will not disregard the plain language of the contract in the guise of effectuating the parties' unexpressed intent). Moreover, the fact that TIF laws permit revenue raised from tax increment financing to be spent on costs within the project area other than those associated with the specific development in question indicates that the intent of the parties and the purpose of the agreement may be construed more broadly than simply ensuring sufficient revenue to pay the TIF bonds on this particular development.

We hold that, as a matter of law, the language providing that "[t]he minimum market value herein established shall be of no further force and effect" eliminates the legal effect of the agreement's minimum market value on valuations occurring after the agreement has been terminated. We reverse the tax court's grant of partial summary judgment for Brookfield and Petula on this issue and remand to the tax court for determination on the remaining issue of whether the assessor's certification complied with the requirements of Minn.Stat. § 273.76, subd. 8 (1984).

Reversed and remanded.

GILBERT, J. took no part in the consideration or decision of this case.