**WALSER AUTO SALES, INC.,**
**et al., Appellants,**

v.

**CITY OF RICHFIELD, et**
**al., Respondents.**

No. C4–01–694.

Court of Appeals of Minnesota.

Nov. 13, 2001.

Bradley J. Gunn, Leonard, Street & Deinard; and Bruce D. Malkerson, Malkerson Gilliland & Martin, LLP, Minneapolis, for appellants.

John M. LeFevre, Jr., Kennedy & Graven, Chartered, Minneapolis, for respondents.

Susan L. Naughton, League of Minnesota Cities, Minnesota NAHRO, St. Paul, for amicus curiae.

Considered and decided by TOUSSAINT, Chief Judge, KLAPHAKE, Judge, and AMUNDSON, Judge.

## O P I N I O N

AMUNDSON, Judge.

Appellants challenge the use of tax-increment financing to fund a redevelopment project. After a court trial, the district court dismissed appellants' complaint and awarded respondents attorney fees. On appeal, appellants allege that the project is defective because (a) the primary beneficiary of the project is a private interest; (b) respondents failed to make adequate efforts to inspect the properties deemed substandard; .(c) the record does not support the determinations that the properties in the area were structurally substandard; and (d) the alleged structurally substandard buildings were not reasonably distributed throughout the tax-increment-financing district. Appellants also allege that they have standing to challenge the use of tax-increment financing and that the district court abused its discretion in awarding respondents attorney fees.

## FACTS

This case involves the use of tax-increment financing (TIF) for the development of a new corporate headquarters for Best Buy Co., Inc. (Best Buy). Appellants Walser Auto Sales, Inc.; Robert J. Walser; Motorworks, Inc.; Paul Walser; and Andrew Walser (collectively "Walser") were the owners or operators of two automobile dealerships on an approximately seven-acre parcel of land located in the City of Richfield, in the northeast quadrant of I–494 and Penn Avenue. The Richfield Housing and Redevelopment Authority (HRA) is a housing and redevelopment authority created in 1974 pursuant to chapter 469 of the Minnesota Statutes.

In June 1993, the city and the HRA (collectively "respondents") consolidated previous redevelopment projects and prospective development property under one plan: the Redevelopment Plan for the Richfield Redevelopment Project Area (the 1993 plan). This plan encompassed approximately 90% of the city, but did not include the land at issue here. As the result of a proposal by CSM Properties (CSM) that called for the development of a hotel, office buildings, townhomes, an apartment building, a restaurant, and an upscale auto dealership to be owned by Walser, respondents, in 1998, sought to expand the 1993 plan to include the area in dispute, known as the Interchange West Area. Because the CSM proposal called for the use of TIF, the city was required to establish an appropriate TIF district. The city then established the Interchange West and Lyndale Gateway Tax–Increment–Financing District (the TIF district), which included 74 residential properties and 16

commercial properties, including the Walser property, in the area bounded by I–494 to the south, 76th Street to the north, Penn Avenue to the west, and Knox Avenue to the east.

To qualify the property as a redevelopment TIF district, respondents needed to show that more than 50% of the buildings within the district were "structurally substandard." Minn.Stat. § 469.174, subd. 10(a)(1) (2000). The city retained the architectural firm YHR Partners (YHR) to investigate the condition of the residential properties and Tom Goodoien, an inspector familiar with TIF evaluations, to investigate the commercial properties.

At the beginning of the investigation, YHR noted that the properties in the district generally appeared to be in good condition and could not "by any means, be classified as 'run down.'" Because "the desired results" may not have been produced by using only standard condition-assessment methodology, YHR recommended an "alternative approach." Under the alternative approach, buildings were assessed using a "life cycle" or depreciation analysis that presumed a limited life span of major building components and estimated the cost of replacing items at the end of their projected life span as compared with the cost of replacing the entire building. YHR had never used the "life cycle" approach before.

After the city agreed to this approach, YHR began assessing the subject properties. The HRA sent out a batch of letters to the property owners requesting permission to enter the properties to inspect them. After explaining that establishment of a TIF district is a prerequisite to "redevelopment of the area," the letters stated:

> One of the steps in the process of creating a [TIF district] is the evaluation of the physical condition of the buildings in the area. YHR * * * will be looking at the houses and apartments in the area. The condition of the buildings will be determined by outside observation together with a review of public records such as building permits. However it is beneficial if the interior of a building can be looked at as well. We are required to make an attempt to enter each building. However, interior evaluations are voluntary.

The letters went on to note that the evaluations would only be used to help determine the type of TIF district that would be created. In closing, the letters noted that follow-up letters would be sent out in a week and that if no response was received within a week of the second letter, the city would "assume" the property owner was "not interested." The follow-up letter was a simple reminder that again noted the voluntary nature of the interior evaluations. Although respondents received only 15 responses, neither YHR, the city, nor the HRA made any phone calls to the property owners. In every other TIF project on which YHR had worked, numerous follow-up phone calls had been made to attempt to obtain permission to inspect the interior of each property.

Because of the low number of responses received, YHR inspected the interiors of only 20% of the buildings it evaluated. The rest were evaluated by viewing them without setting foot on the property (i.e., from the street) and by reviewing other sources, including county assessor tax information, building-permit information, property-transfer records, and maps. The inspectors did not review fire or police inspections or any other on-site reports for the properties.

Ultimately, YHR found 91% of the buildings to be structurally substandard. This finding was substantially based on the fact that the buildings were not insulated in conformance with the standards for new

construction in the current Minnesota Energy Code (the energy code). Most of the determinations regarding these energy code violations were made without interior inspections. In order to determine whether the buildings satisfied current energy standards, YHR extrapolated from the information they gathered in the 15 residential buildings that they were actually able to inspect. In contrast, YHR failed to similarly extrapolate on data tending to raise the estimated value of the homes. For example, all 15 interior-inspected homes were found to have upgraded cabinetry. Yet YHR assumed that none of the remaining homes had similarly upgraded cabinetry. Neither YHR, the city, nor the HRA sent copies of their reports to homeowners so that any errors might be corrected.

Based on the YHR report (and Goodoien's report incorporated therein), the HRA recommended approval of the TIF Plan. In June 1999, the city adopted the findings in the YHR Report and, in reliance thereon, determined that more than 50% of the buildings in the proposed TIF district were "structurally substandard." The city then approved the TIF district. At the same time, the city adopted a Modification to the Redevelopment Plan for the Richfield Redevelopment Project Area (the 1999 plan modification), which added the Interchange West Area and the CSM-proposed structures to the 1993 plan, and adopted the related tax-increment-financing plan (the TIF plan) to serve as a funding source for implementing the 1999 plan modification.

Shortly after the city modified the 1993 plan for CSM, CSM abandoned its proposal. Consequently, the HRA began negotiations with Best Buy for the construction of a new corporate headquarters in the TIF district. Eventually Best Buy and the city reached an agreement to build a 1.5 million-square-foot office facility in the Interchange West Area. In August 2000, the HRA began condemnation proceedings against Walser that resulted in the district court granting a quick-take condemnation over Walser's objection. Walser appealed, and we recently affirmed. *Housing & Redev. Auth. in and for the City of Richfield v. Walser Auto Sales, Inc.*, 630 N.W.2d 662 (Minn.App.2001), *review granted* (Minn. Sept. 25, 2001) (*Walser I*).

Contemporaneous with the initiation of the condemnation proceedings, Walser simultaneously filed an action challenging the use of tax-increment financing for the development. The complaint stated five causes of action. In count I, Walser challenged the collection of tax increment by challenging the inclusion and retention of parcels of property within the TIF district. Specifically, Walser challenged the city's determination that buildings in the TIF district were "structurally substandard," alleging that: (a) the city and HRA failed to use their best efforts to obtain permission for interior inspections; (b) the methodology employed to arrive at the determination was flawed and result-oriented; and (c) that the structurally substandard buildings were not reasonably distributed throughout the TIF district. In count II, Walser challenged the collection of tax increment by challenging the city's findings that, "but for" the creation of the TIF district, the subject properties would not be developed. In count III, Walser challenged the expenditure of the revenue for the project as not being authorized by Minn.Stat. § 469.176 (2000). In count IV, Walser challenged the expenditure of public funds for a predominantly private purpose. In count V, Walser challenged the proposal as unlawfully speculative and conditional under the terms of the agreement, and because the environmental-review process had not been completed.

The city and the HRA moved for summary judgment with respect to each of Walser's claims, arguing that Counts I and II were not authorized under Minn.Stat. § 469.1771, subd. 1 (1990), and that there was no improper conduct in the creation of the TIF district or the proposed expenditure of TIF funds. Reserving its ruling on this motion, the court held a bench trial on December 26 and 27, 2000.

On January 19, 2001, the court dismissed the Walser complaint in its entirety as a matter of law, finding that there was a reasonable factual basis in the record to sustain the city's findings in support of the TIF district and the establishment of the TIF plan, and that Walser did not, as a taxpayer, have standing to maintain a cause of action for counts I and II. Shortly thereafter, the court granted the city's and HRA's motion for attorney fees and costs as the prevailing parties pursuant to Minn. Stat. § 469.1771, subd. 1(a) (2000). This appeal followed.

## ISSUES

I. Do citizen taxpayers have standing to challenge the inclusion of property within a tax-increment-financing district for districts formed before May 15, 2000?

II. Does a citizen-taxpayer have standing to challenge the retention of property within a tax-increment-financing district?

III. Is a district court's conclusion that a particular expenditure was for "a public purpose" sufficient to satisfy requirement that all public expenditures be primarily for a public purpose?

IV. Was a redevelopment-tax-increment-financing district properly established in this case?

## ANALYSIS

### I.

■ Counts I and II of the complaint allege that property was improperly in-cluded or retained in the TIF district as modified. The Minnesota statutes in effect at the time the TIF district was created prohibited the improper inclusion or retention of property within a TIF district. Minn.Stat. § 469.1771, subd. 2 (1990). Nevertheless, the district court determined that Minn.Stat. § 469.1771 (1990) did not contemplate a private cause of action for violations of subdivision 2 of that statute. Statutory construction is a question of law, which we review de novo. *Brookfield Trade Ctr., Inc. v. Cty. of Ramsey*, 584 N.W.2d 390, 393 (Minn.1998).

■ Minn.Stat. § 469.1771, subd. 1(a) (1990) provided that owners

of taxable property located in the city * * * in which the tax increment financing district is located may bring suit *for equitable relief or for damages, as provided in subdivisions 3 and 4,* arising out of a failure of a municipality or authority to comply with the provisions of sections 469.174 to 469.179, or related provisions of this chapter.

(Emphasis added.) When a statute, read according to ordinary rules of grammar, is unambiguous, that plain language is followed. *Boatwright v. Budak*, 625 N.W.2d 483, 485–86 (Minn.App.2001), *review denied* (Minn. July 24, 2001). Ambiguity only arises when the statutory language is subject to more than one reasonable interpretation. *Amaral v. St. Cloud Hosp.*, 598 N.W.2d 379, 384 (Minn.1999).

The phrase "as provided in subd. 3 and 4" is set off by commas immediately following the phrase "for equitable relief or for damages" and constitutes an appositive. The Minnesota Supreme Court has held that appositive phrases set off by commas should be construed to modify only the immediately preceding noun, pronoun, or clause, "unless it is clear that it

was intended to apply to subsequent matter." *Dahlberg v. Young,* 231 Minn. 60, 66–67, 42 N.W.2d 570, 575 (1950) (emphasis omitted). But application of the appositive rule does not always result in an unambiguous phrase because the object of the appositive is not always clear. *Compare State v. Bauman,* 552 N.W.2d 576, 577–78 (Minn.App.1996) (absent evidence of contrary legislative intent, statute was construed so that proviso modified immediately preceding noun), *review denied* (Minn. Nov. 20, 1996) *with Pickands Mather & Co. v. Comm'r of Revenue,* 334 N.W.2d 155, 163 (Minn.1983) ("We think, however, within the context of this statute, that the concluding phrase 'or any other law' * * * modifies the entire preceding portions of the subdivision rather than merely the immediately preceding clause.") (emphasis omitted). Here, because we see no clear indication as to whether the phrase "as provided in subdivisions 3 and 4" modifies just "damages" or both "damages" and "equitable relief," application of the rules of grammar does not result in unambiguous language.

> In interpreting ambiguous language,
>
> the intention of the legislature may be ascertained by considering, among other matters: (1)[t]he occasion and necessity for the law; (2)[t]he circumstances under which it was enacted; (3)[t]he mischief to be remedied; (4)[t]he object to be attained; (5)[t]he former law, if any, including other laws upon the same or similar subjects; (6)[t]he consequences of a particular interpretation; (7)[t]he contemporaneous legislative history; and (8)[l]egislative and administrative interpretations of the statute.

Minn.Stat. § 645.16 (2000). Walser argues that the legislative history shows that subdivision 1 was intended to provide equitable relief for any violation of the tax-increment statute, but limit damages to violations of subdivisions 3 and 4. But review of the legislative history of the 1990 statute reveals only that the legislature intended broad-based grounds for taxpayer enforcement of the TIF statute and does nothing to illumine the specific issue at hand. Indeed, even Walser's proposed construction does not give citizens plenary enforcement power. Knowledge that the legislature sought to grant citizens the power to enforce the TIF laws does not itself answer how that goal was to be achieved.

■ Respondents ask us to apply the doctrine of *expressio unius est exclusio alterius.*[1] Because Minn.Stat. § 469.1771, subd. 1 (1990), mentions subdivisions 3 and 4, yet omits subdivision 2, they conclude that subdivision 2 was outside the embrace of citizen-taxpayer enforcement. This maxim, however, fails to resolve the ambiguity because Walser has argued that this exclusion is limited to suits *for damages* and does not apply to suits for equitable relief. While the doctrine may help answer the question, "is subdivision 2 excluded?," it does not answer the question, "from what is subdivision 2 excluded?"

The omission of subdivision 2 from the citizen-taxpayer enforcement provision may have been, as respondents admit, nothing more than a drafting error. Though in interpreting an act to ascertain and accomplish the legislative purpose, "obvious mistakes and omissions may be corrected or supplied," *Mankato Citizens*

---

**1.** A maxim of statutory interpretation meaning that the "expression of one thing is the exclusion of another." *Black's Law Dictionary* 581 (6th ed.1990) (citations omitted). It is only used where it is first determined that the language is ambiguous. *Colangelo v. Norwest Mortgage, Inc.,* 598 N.W.2d 14, 17–18 (Minn.App.1999), *review denied* (Minn. Oct. 21, 1999).

*Tel. Co. v. Comm'r of Taxation*, 275 Minn. 107, 112, 145 N.W.2d 313, 317 (Minn.1966) (citation omitted), respondents' admission does not by itself transform an ambiguous phrase into an obvious mistake. We do not find the conclusion that the legislature made a mistake to be "obvious."

Respondents argue that, even assuming this were nothing more than a drafting error, this court should not "correct" that error because the legislature already has done so, and has thus prescribed how it was done. Shortly after the formation of the TIF district, the legislature modified the statute to read:

> The owner of taxable property located in the city * * * in which the tax increment financing district is located may bring suit for equitable relief· or for damages, *as provided in subdivisions 2, 3, and 4,* arising out of a failure of a municipality or authority to comply with the provisions of sections 469.174 to 469.179, or related provisions of this chapter.

Minn.Stat. § 469.1771, subd. 1(a) (2000) (emphasis added). This modification came ten years after the preceding version of the TIF Act was passed and was enacted in response to an unpublished opinion of the federal district court that construed the 1990 version as excluding taxpayer suits for violation of subdivision 2. *See Nielsen v. City of Roseville*, No. 98–1625 (D.Minn.1999).

■ Respondents suggest that the legislative response to the *Nielsen* decision amounts to a modification of the law. But does this interpretation comport with re-spondents' own admission that the omission of subdivision 2 in the 1990 statute was likely nothing more than a drafting error? In contrast, Walser suggests that the 2000 legislature was, in effect, merely correcting the *Nielsen* court and the drafting error in the 1990 statute. Indeed, where the legislature's intent is difficult to ascertain, a subsequent amendment must not necessarily be read as an intent to change the existing law. *See State v. Andrews*, 297 Minn. 260, 263–64, 212 N.W.2d 863, 865 (1973) (declining to construe the deletion of a statutory clause as a change in the law, where another explanation was equally probable). But what explains the legislature's decision not to specifically apply the remedial statute retroactively?[2]

■ Unlike the amorphous legislative intent in *Andrews*, here the intent is clear. The legislative history of the 2000 amendment indicates that the legislature had the option of applying the amendment retroactively, but instead applied it prospectively.[3] Even if the legislature intended to merely correct its oversight, its chosen *method* was to change the law. Accordingly, the district court did not err in concluding that Minn.Stat. 469.1771, subd. 1 (1990), did not include a private cause of action for the inclusion or retention of property within a TIF district.

### II.

Walser claims that not only did the city err in including certain properties within the TIF district, but also that the city erred in *retaining* those properties. Minn. Stat. § 469.1771, subd. 2 (2000), provides

---

**2.** Although the law neither stated that it should be applied prospectively, nor that it should not be applied retroactively, its effective-date clause stated that the amendment was "effective for violations occurring after [May 15, 2000]." 2000 Minn. Laws, Ch. 490, Art. 11, Sec. 30.

**3.** As originally introduced, the section of the amendment adding subdivision 2 to section 469.1771 had the following effective date provision: "This section is effective for violations occurring after December 31, 1990." H.F. 4099, § 16, as introduced (Mar. 13, 2000).

for a taxpayer enforcement suit if the city "includes *or retains* a parcel of property in a tax increment financing district that does not qualify for inclusion or retention within the district." (Emphasis added.)

■ Respondents argue that because the 2000 statutory amendment was prospective, it should also be applied prospectively with regard to retention. But prospective application of the 2000 amendment simply means that violations occurring after the amendment are actionable. As the retention of the property continued past the effective date of the 2000 amendment, prospective application grants Walser a right to sue for improper retention of property.

Respondents next argue that the retention of the allegedly non-qualifying properties was an ongoing effect of the earlier violation. In effect, respondents argue that the legislature's drafting error not only abrogated Walser's right to enforce the statute that limits the creation of a TIF district, but also that this error carries its effect over into the retention of illegally-retained properties. Respondents cite absolutely no law in support of this interpretation. Minn.Stat. § 469.1771, subd. 2 (2000) explicitly includes both inclusion *and* retention within the taxpay-

er's-suit provision. When possible, we construe laws to give effect to all their provisions. Minn.Stat. § 645.16 (2000). We cannot omit the clause "or retains" from the statute.

## III.

■ Walser's fourth claim alleges that the contemplated expenditure of revenues from the TIF district was unlawful because it did not primarily serve a public purpose.[4] Public money may only be expended for public purposes. *Port Auth. of St. Paul v. Fisher*, 269 Minn. 276, 294, 132 N.W.2d 183, 196 (1964). If "the primary object is to promote some private end, the expenditure is illegal, although it may incidentally also serve some public purpose." *Id.* at 288, 132 N.W.2d at 192 (emphasis omitted). Likewise, "[t]he mere fact that some private interest may derive an incidental benefit from the activity does not deprive the activity of its public nature if its primary purpose is public." *Visina v. Freeman*, 252 Minn. 177, 184, 89 N.W.2d 635, 643 (Minn.1958).

■ Here, the district court found that the contemplated expenditure served a public interest. But the key question here is not whether the public interest was

---

4. As a preliminary matter, respondents argue that Walser is precluded from challenging whether expenditures are for a primarily public purpose by Minn.Stat. § 469.175, subd. 3 (2000), which states:

Once approved, the determination of the authority to undertake the project through the use of tax increment financing and the resolution of the governing body shall be conclusive of the findings therein and of the public need for the financing.

Even though Walser is unable to challenge the inclusion of property into the TIF district, this language cannot have the preclusive meaning given to it by respondents. Respondents' construction would effectively eviscerate all taxpayer's rights under Minn.Stat. § 469.1771, subds. 3, 4 (1990, 2000), because

if the establishment of the TIF district conclusively determined its legality, then the decisions of any city would be completely insulated from review. The Minnesota Supreme Court has rejected a similar argument, noting that a plaintiff had the right to oppose a municipality's action and that

such right would carry with it an attendant right to challenge the adequacy of the evidence upon which the municipality based its findings cannot be seriously questioned, for were the rule otherwise, the statutory restrictions would be completely ineffectual.

*Reilly Tar & Chemical Corp. v. City of St. Louis Park*, 265 Minn. 295, 303, 121 N.W.2d 393, 398 (Minn.1963). We think the same wisdom applies here.

served, but rather which purpose is the primary purpose. The district court's findings that the proposed expenditures were for "*a* public purpose" (emphasis added) because they would be used for land acquisition and public improvements pursuant to Minn.Stat. § 469.002, subd. 14 (2000), is tautological and only begs the question of whether the public purpose is *primary*. The fact that the expenditures are authorized expenditures under the TIF act does not mean that they primarily serve a public purpose.[5] There is no evidence that the TIF act has abolished the requirement that public expenditures must primarily be for public purposes. Because the district court applied the wrong standard and failed to make comparative findings, we are unable to review the district court's decision on this issue and, of necessity, remand for comparative findings.

### IV.

The district court alternatively concluded that the record at trial established that the creation of the TIF district was lawful in all respects. It was not. The record shows that several aspects of the TIF-district creation were fundamentally flawed.

*"Best Efforts"*

▮▮▮▮ The legislature has directed that the city may not determine whether a property is structurally substandard without an interior inspection of the property, unless, *inter alia,* "the municipality or authority is unable to gain access to the property after using its *best efforts* to obtain permission from the party that owns or controls the property." Minn.Stat. § 469.174, subd. 10(c) (2000) (emphasis added).[6]

Respondents argue that the two letters they sent out constituted "best efforts," but such a conclusion would give a very strange meaning to the imperative. Respondents' letters merely stated that they were requesting a voluntary inspection as part of an assessment of "what type" of city redevelopment was to be created.

---

5. This inquiry is distinct from the question asked in condemnation proceedings, which is merely whether some evidence exists that the taking serves a public purpose. *Walser I,* 630 N.W.2d at 669. While we are extraordinarily deferential to a city's determination of whether a particular expenditure serves a primarily public purpose, *R.E. Short Co. v. City of Minneapolis,* 269 N.W.2d 331, 337 (1978), we note that the city's discretion is less than that used in condemnation proceedings because, in those cases, the existence of almost any evidence will support a finding of a public purpose. *Walser I,* 630 N.W.2d at 668. Though deference is still required here, the fact that the district court must employ the more stringent evidentiary standard requiring that the public purpose to be the "primary purpose" means that a greater quantum of evidence is required. Furthermore, not only must the quantity of the evidence considered be greater, but the quality of the analysis must be different. The expenditure of funds requires a comparative approach; that is to say, analysis of which purpose (public or private) is the primary purpose. *Compare Visina,* 252 Minn. at 184, 89 N.W.2d at 643 (incidental private benefit does not render activity private if primary purpose is public) *with Fisher,* 269 Minn. at 288, 132 N.W.2d at 192 (incidental public benefit does not change nature of otherwise primarily private act).

6. While respondents argue that great deference should be given to the city's determination of whether "best efforts" were used, they do not articulate why this should be the standard. It is, in fact, broader. The determination of whether or not the city complied with the TIF law does not involve a legislative question. The statute sets out the standard to be applied, and the only question is whether the city complied with the law. Here, the facts surrounding the notification letters and the attempts at interior inspections are not disputed. Application of a statute to the undisputed facts of a case involves a question of law, which is reviewed de novo. *Boubelik v. Liberty State Bank,* 553 N.W.2d 393, 402 (Minn.1996).

They gave property owners one week to respond. After respondents mailed a cursory second letter giving property owners another week to respond, non-responding property owners were presumed to "not be interested." Respondents made no further efforts to contact the residents even though their approach resulted in only 20% of the buildings being inspected. No phone calls were made, although such practices are typical in TIF projects. No doors were knocked, despite the fact that the area to be inspected was quite small.

If the question posed by Minn.Stat. § 469.174, subd. 10(c), was, as indicated by respondents, whether or not the city made "an effort," clearly the city's methodology would have been sufficient. But the statute specifically requires "best efforts." "Best" is defined as "surpassing all others in excellence, achievement, or quality: most excellent." *The American Heritage Dictionary* 178 (3rd ed.1996). The fact that other, more thorough, methods were readily available, and were often used in other TIF districts, combined with the fact that the city's methodology only achieved a 20% success rate, is powerful evidence that "best" efforts were not utilized.

Respondents argue that there is no specific requirement in the statute to make phone calls, but they miss the point. The statute also does not state that sending two brief letters with two-weeks' total response time is sufficient either. The statute requires "best" efforts, and the efforts needed to satisfy that standard are substantially more than what respondents gave.

*Distribution of the Buildings*

■ To qualify as a redevelopment district under Minnesota law, the structurally substandard buildings must be "reasonably distributed throughout the district." Minn.Stat. § 469.174, subd 10(a). The city's determination with regard to this factor is quasi-judicial, which is reviewed to determine whether the city "erred as a matter of law, issued a decision unsupported by substantial evidence, or acted arbitrarily or capriciously." *Soo Line R.R. Co. v. City of Minneapolis,* 625 N.W.2d 834, 838 (Minn.App.2001) (quotation omitted).

Here, even a cursory review of the exhibits submitted reveals that the allegedly substandard properties were not "reasonably distributed" throughout the district at all. All of the allegedly substandard buildings were located in the north 60% of the district. Furthermore, these two groups of properties are easily distinguishable. While the northern properties were mostly residential homes and apartments, the southern properties were all large businesses with frontage on I-494. 77th Street, which divides the northern portion from the southern, is a clear dividing line between these two groups of properties. Almost all of the structures north of 77th street were determined to be substandard. Very few allegedly substandard properties were south of 77th street—all of which were on the north side of blocks between I-494 and 77th street with frontage on 77th street, and not I-494. The fact that inclusion of certain property may increase the value of a redevelopment district does not excuse the requirement that structurally substandard properties be reasonably distributed throughout the district.

*Methods for Determining Conditions of Buildings*

■ As noted, in order for the Interchange West Area to be designated as a redevelopment TIF district, more than 50% of the buildings in the district must be "structurally substandard to a degree requiring substantial renovation or clearance." Minn.Stat. § 469.174, subd. 10(a)(1) (2000). "Structurally substandard" is defined as:

containing defects in structural elements or a combination of deficiencies in essential utilities and facilities, light and ventilation, fire protection including adequate egress, layout and condition of interior partitions, or similar factors, which defects or deficiencies are of sufficient total significance to justify substantial renovation or clearance.

Minn.Stat. § 469.174, subd. 10(b) (2000). Walser challenges the methodology used by respondents to determine that buildings were structurally substandard.[7]

A building is *not* structurally substandard if it is in compliance with the building code applicable to new buildings or could be modified to satisfy the building code at a cost of less than 15 percent of the cost of constructing a new structure of the same square footage and type on the site. The municipality may find that a building is not disqualified as structurally substandard under the preceding sentence on the basis of reasonably available evidence, such as the size, type, and age of the building, the average cost of plumbing, electrical, or structural repairs, or other similar reliable evidence.

Minn.Stat. § 469.174, subd. 10(c) (emphasis added). Even if a municipality has used its best efforts to gain access to a property, those properties that do not receive interior inspections may not be determined to be structurally substandard unless "the evidence otherwise supports a reasonable conclusion that the building is structurally substandard." *Id.*

YHR conducted the structurally substandard analysis for the residential properties. As noted, YHR initially noted that the properties were generally in good condition and that the standard methodology for determining whether structures were structurally substandard would not achieve the "desired results." After consulting with the city, YHR then proceeded to employ an alternative approach involving lifecycle or depreciation analysis. The city adopted YHR's findings resulting from this analysis. Although an extensive review of YHR's methods may not be necessary, certain errors are readily apparent.

First, although Minn.Stat. § 469.174, subd. 10(c), specifically provides a mathematical formula for determining, for certain, when a building is *not* structurally substandard, YHR flipped this guideline around; every property that the statutory formula did not specifically except from those potentially structurally substandard was determined to be structurally substandard. There is no legal basis for this methodological assumption.

Second, in assessing the code deficiencies of properties without interior inspections, YHR extrapolated from the results of the 15 homes that they actually inspected, to determine the condition of the re-

---

**7.** The parties have significantly different conceptions of the applicable standard of review. As the term "structurally substandard" is a statutory provision, complete with a built-in definition and methodology for determining whether a building is structurally substandard, *see* Minn.Stat. § 469.174, subd. 10 (2000), interpretation of this statute should be reviewed de novo. *See Brookfield Trade Ctr.,* 584 N.W.2d at 393. But the city's consideration of the evidence in light of the statutory mandate is a quasi-judicial function. The indicia of quasi-judicial actions are "(1) investigation into a disputed claim and weighing of evidentiary facts; (2) application of those facts to a prescribed standard; and (3) a binding decision regarding the disputed claim." *Maye v. University of Minnesota,* 615 N.W.2d 383, 386 (Minn.App.2000) (quoting *Minnesota Ctr. for Envtl. Advocacy v. Metropolitan Council,* 587 N.W.2d 838, 842 (Minn. 1999)) (citation omitted). This court reviews a city's quasi-judicial decisions to determine whether the city council "erred as a matter of law, issued a decision unsupported by substantial evidence, or acted arbitrarily or capriciously." *Soo Line R.R.,* 625 N.W.2d at 838 (quotation omitted).

maining homes. At the same time, in determining the homes' replacement costs, YHR did not employ similar extrapolations to determine how many of the uninspected properties had certain improvements.

Third, YHR selected a depreciation model that resulted in cost estimates for the same items varying wildly between homes and were overstated as compared with actual costs. YHR's analysis also contained numerous mathematical and depreciation flaws. The numerous flaws in the data considered by YHR resulted in the district court doubting the accuracy of YHR's replacement values as too low and their estimates of the cost of corrections to the code violations as too high.

Fourth, an overwhelming majority of the cost of code compliance consisted of the cost of compliance with the energy code. The unrebutted testimony of several experts, including one of YHR's own consultants was that violations of the energy code were not "structural." While the energy code may be sound public policy, the determination of whether energy code deficiencies should be included in the consideration of whether a property is "structurally substandard" is a matter of statutory construction, a question of law reviewed de novo. *Brookfield Trade Ctr.*, 584 N.W.2d at 393. There is absolutely no basis for concluding that substandard insulation is a structural deficiency or a deficiency "in essential utilities and facilities." *See* Minn. Stat. § 469.174, subd. 10(b) (defining "structurally substandard"). Furthermore, consideration of modern insulation standards as a component of whether a building is structurally substandard might result in all but the most modern homes being determined to be "structurally substandard." Accordingly, consideration of the energy code in determining whether properties were structurally substandard

within the meaning of Minn.Stat. § 469.174, subd. 10 was error.

Fifth, when considering uninspected properties, the TIF act provides that evidentiary items that support a finding that a building is structurally substandard include "recent fire or police inspections, onsite property tax appraisals or housing inspections, exterior evidence of deterioration, or other similar reliable evidence." YHR did not review any such documents or other similar reliable evidence.

When viewed as a whole, the methodology employed by YHR for determining whether the subject properties were structurally substandard was rife with inaccuracies. The statute provides several significant layers of protection for municipal taxpayers and property owners, most of which were ignored here. First, the statute strongly advocates interior inspections and alternatively provides that a determination may be made by other evidence "similarly reliable" to common types of interior inspections used to determine the structural adequacy of particular properties. Minn.Stat. § 469.174, subd. 10. Second, the statute prevents gerrymandering of TIF districts by requiring substandard properties to be "reasonably distributed" throughout the district. Minn.Stat. § 469.174, subd. 10(a). Finally, the statute provides a limited definition of what constitutes substandard property.

The actual procedure implemented by the city and HRA consisted of two minimalist contact letters with short turnaround times that resulted in only 20% of the buildings receiving interior inspections. For the remaining 80% of the properties in question, respondents only made a cursory review of some of the less reliable inspection records available and educated guesses about the interior conditions in the homes at issue. Finally, the city conveniently drew the TIF district lines to in-

clude the valuable property with I–494 frontage even though none of the allegedly substandard buildings were found within this region.

Tax-increment financing is a power granted to municipalities by the legislature to be exercised only within the constraints of the legislative fiat. Exhibiting a particular municipal meanness, respondents completely ignored the statutory prerequisites for exercise of this financing tool. The provisions of Minn.Stat. § 469.1771 (2000) are intended to provide a means to ensure that such a blatant disregard for limits on municipal authority will be answerable.

## V.

Walser's claim under Count III is that the expenditure of the TIF funds was in violation of Minn.Stat. § 469.176. The district court concluded that

> the TIF funds would be used for land acquisition and public improvements which are authorized uses of TIF funds pursuant to the TIF Act, and consistent with the TIF plan.

Walser has not challenged the dismissal of this count in either of its briefs. Issues not briefed on appeal are waived. *Melina v. Chaplin,* 327 N.W.2d 19, 20 (Minn.1982).

## VI.

Walser challenges the fees awarded to respondents. As the prevailing party in this action, respondents were entitled to reasonable costs and attorney fees under Minn.Stat. § 469.1771. But because we reverse and remand the district court's decision, the district court's determination regarding fees—premised on its determination of which party prevailed—should also be revisited on remand.

## DECISION

The district court erred by dismissing count I and II of the complaint and by applying the wrong standard in dismissing count IV. The district court's alternate ground for dismissal, that the tax-increment-financing district was created lawfully, was also in error.

**Reversed and remanded.**