# United States Court of Appeals

### For the Eighth Circuit

_____

No. 12-1956

_____

Robert W. Kramer, III, doing business as CIS Internet Services,

*Plaintiff - Appellant*,

v.

Cash Link Systems, A Florida corporation; AmeriP O S, Inc. a Florida corporation; OTB Products, A Florida corporation; AMP Dollar Savings, Inc. an Arizona corporation doing business as MortgageLeads.tv, doing business as Leads.tv; Healthstop, Inc. a Minnesota corporation, doing business as Health Stop Shop; Michael Moebeck, a Minnesota resident; Joseph Ingersoll, a Minnesota resident; Internet Services Zocalo, a California corporation; GZ Media, Inc. a New York corporation, doing business as 24/7 Downloads; TEI Marketing Group, a Florida corporation,

*Defendant*s,

National Credit Systems, Inc. a New York corporation,

*Defendant - Appellee*,

Jerry Poole, a Florida resident; Carmen Lyman, a Massachusetts resident, also known as Carmen Rodriguez; Kevin Hertz, a California resident; Mihir Teneja, a Florida resident,

*Defendant*s.

_____

Appeal from United States District Court
for the Southern District of Iowa - Davenport

_____

Submitted: December 12, 2012
Filed: May 28, 2013
_____

Before LOKEN, MELLOY, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Robert Kramer alleged that National Credit Systems ("NCS") conducted a spam e-mail campaign that harmed his business, in violation of Iowa and federal law. After a bench trial, the district court[1] entered judgment in favor of NCS and dismissed Kramer's claims. Kramer appeals, and we affirm.

I.

Robert Kramer owned and operated CIS Internet Services ("CIS"), a small Internet service provider in Clinton, Iowa. Kramer claims that between 2001 and 2003, spam e-mails flooded CIS's server, interfering with the ability of CIS's customers to access the Internet. Many of the spam e-mails advertised the debt collection services of NCS.

After filing an initial complaint against 300 unnamed defendants, Kramer filed an amended complaint in 2004, naming NCS, a New York corporation, as a defendant, and asserting that NCS was responsible for many of the spam e-mails that damaged CIS. Kramer alleged violations of the Iowa anti-spam statute in effect at the time, Iowa Code § 714E.1 (2003) (repealed 2005), the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, and the federal Computer Fraud

_____

[1]The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa.

and Abuse Act, 18 U.S.C. § 1030. He also brought several Iowa common-law causes of action. NCS denied the allegations, and the case proceeded to a bench trial.

At trial, Kramer sought to prove that William Stolars, a salesman, sent the e-mails on behalf of NCS. The e-mails at issue advertised NCS's services, were similar to other NCS advertisements, and contained accurate contact information for NCS. But all of that information was publicly available, and an information-technology specialist testified that the e-mails had been routed through servers in foreign countries, so none of them could be traced to the original sender. Chris Rehkow and Lynn Goldberg, the only shareholders of NCS, both testified that they neither sent the spam e-mails themselves nor authorized any employee to send the e-mails.

Kramer and his former attorney, Pete Wellborn, testified that Stolars admitted to sending the e-mails. In his deposition, Wellborn claimed that he called the telephone number listed in the e-mails and spoke with Stolars. According to Wellborn, Stolars admitted that he worked for NCS and that he was sending the spam e-mails on behalf of NCS. Kramer testified that he spoke with Rehkow and Stolars, both of whom acknowledged that Stolars was sending the e-mails. According to Kramer, Rehkow admitted that Stolars was in charge of marketing and was running the e-mail campaign. Rehkow denied ever speaking with Kramer. Stolars was unavailable to testify because he died before the trial.

Goldberg acknowledged that a salesperson could have conducted the e-mail campaign without telling him or Rehkow. But Goldberg explained that the entire sales force—including Stolars—operated as independent contractors, rather than as employees. NCS introduced several sample contracts that it executed with its sales force, all of which provided that the salespeople would be independent contractors. Although Stolars's contract was lost, Goldberg stated that Stolars would have signed a form contract similar to the contracts in evidence.

The district court entered judgment in favor of NCS. The court credited the testimony of NCS's principals, describing their testimony as "the most persuasive evidence" of Stolars's relationship to NCS. It also noted that Kramer and Wellborn had reasons "to stretch the truth about what Stolars told them on the phone," and found that they were "not sufficiently credible" to support key parts of their testimony about the telephone calls. The district court did not make a finding about whether Stolars sent the spam e-mails. But the court ruled that even if he did, then NCS was not liable, because Stolars was an independent contractor, not an employee as Kramer asserted. The court concluded that "neither Re[h]kow nor Goldberg, nor any other authorized NCS agent, initiated SPAM e-mails to market NCS's debt collection business or for any other purpose."

We dismissed Kramer's first attempt to appeal the district court's decision for lack of a final judgment. Now that all remaining defendants have been dismissed with prejudice, the judgment below is final, and we have jurisdiction over this appeal. *See* 28 U.S.C. § 1291.

II.

Kramer contends that the district court erred in rejecting two alternative theories of recovery. First, he asserts that NCS's principals, Rehkow and Goldberg, authorized the spam e-mail campaign, and that the district court erred in finding to the contrary. Second, he argues that NCS is accountable for the actions of its employees, and that the district court erred by concluding that Stolars was not an employee of NCS. While Kramer's state-law claims are governed by the substantive law of Iowa, *see Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), the standard of review is a procedural issue that is governed by federal law. *Mayer v. Gary Partners & Co.*, 29 F.3d 330, 334 (7th Cir. 1994); *Felder v. United States*, 543 F.2d 657, 664 (9th Cir. 1976); *see Newberry v. Burlington Basket Co.*, 622 F.3d 979, 983 (8th Cir. 2010).

We thus apply Federal Rule of Civil Procedure 52(a), which provides that we must not set aside the district court's findings of fact unless they are clearly erroneous.

A.

Kramer argues that documentary evidence contradicts the testimony of Rehkow and Goldberg that NCS did not engage in any "mass mail campaigns" or direct anyone to send spam e-mails. He contends that the inference is inescapable that the principals employed e-mail marketing techniques, because the spam e-mails advertised NCS's services with a valid e-mail address, the messages were similar to various online advertisements posted by NCS, and NCS elsewhere encouraged customers to contact the company by e-mail. This evidence might support an inference that NCS's principals were involved with the e-mails, but it does not compel that conclusion. The e-mails could not be traced to NCS, and anyone could have composed the e-mails by copying and pasting text from NCS's website or its other advertisements. Therefore, the testimony of Rehkow and Goldberg on this score was not contradicted by the documentary evidence.

Kramer also contends that the court should have credited his testimony that Rehkow admitted over the phone that NCS was responsible for the e-mail campaign. Kramer relies on an e-mail that he says was written to memorialize the conversation. In the e-mail, Kramer wrote that after he called NCS to complain about spam e-mails, a receptionist told him to expect a call from the chief executive officer of NCS, and that he then received a call from a man named "Chris," which is Rehkow's first name. Chris purportedly said that "he could not understand how anything like this could happen," and that "cis.net was not on their list."

On its face, however, Kramer's summary of the call does not reflect an admission by Rehkow that NCS was responsible for the spam e-mails. The quoted comments are more akin to a denial. The district court, moreover, thought Kramer's

e-mail "deserve[d] less weight than if it were notes handwritten or prepared at the precise time" of the conversation. The court also was generally skeptical of Kramer's credibility, saying that he "exaggerated" his testimony about NCS's responsibility and damages, provided testimony that was "not always consistent with the content of documentary evidence," and "gave guarded and unpersuasive answers" about some of his activities. It was not clear error for the court to find no admission by Rehkow.

If a witness's testimony is "coherent and facially plausible," and is not contradicted by extrinsic evidence, then a district court's decision to credit the testimony "can virtually never be clear error." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). The district court heard from Kramer, Rehkow, and Goldberg in a bench trial, and it found NCS's principals more credible than Kramer. The evidence cited by Kramer does not establish a clear error.

## B.

Kramer next contends that the district court erred by concluding that Stolars was an independent contractor rather than an employee of NCS. Kramer argues that because Stolars sent the spam e-mails as an employee of NCS, the company should be vicariously liable for his actions. The district court made no finding about whether Stolars sent the e-mails, but it rejected Kramer's theory of vicarious liability because it concluded that Stolars was an independent contractor. Assuming for the sake of analysis that NCS could be held responsible for the actions of its employee under each of Kramer's causes of action, we agree with the district court that Stolars is better viewed as an independent contractor.

To urge that Stolars was an employee, Kramer relies on the test employed by federal courts to determine whether a party is an "employee" for the purposes of federal statutes that use the term without defining it. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-23 (1992); *Cmty. for Creative Non-Violence v. Reid*,

490 U.S. 730, 739-41 (1989). In *Darden* and *Reid*, the Supreme Court applied the following common-law test:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Darden*, 503 U.S. at 323-24 (quoting *Reid*, 490 U.S. at 751-52). No single factor is determinative, *Reid*, 490 U.S. at 752, and courts should consider "all aspects of the working relationship." *Wilde v. Cnty. of Kandiyohi*, 15 F.3d 103, 106 (8th Cir. 1994). But the first factor—whether the hiring party has the right to control the means of performance—is a "primary consideration." *Schwieger v. Farm Bureau Ins. Co. of Neb.*, 207 F.3d 480, 484 (8th Cir. 2000).

Although the parties do not mention it, Iowa law sets forth a similar but not identical analysis for distinguishing employees from independent contractors. Iowa's test takes account of ten factors:

> (1) the individual's right to control the physical conduct and progress of the work, except as to final results; (2) whether the individual was on the employer's payroll; (3) the method of payment, whether by time or by job; (4) the individual's obligation to furnish necessary tools, supplies, and materials to accomplish the work; (5) the existence of a contract for the performance by a person of a certain piece or kind of work at a fixed

price; (6) the independent nature of the individual's business; (7) the individual's employment of assistants, with the right to supervise their activities; (8) the time for which the individual is employed; (9) whether the work is part of the regular business of the employer; and (10) the intent of the parties.

*Fesler v. Whelen Eng'g Co.*, 688 F.3d 439, 442-43 (8th Cir. 2012) (citing *Iowa Mut. Ins. Co. v. McCarthy*, 572 N.W.2d 537, 542-43 (Iowa 1997)). As under federal law, "the primary focus is on the extent of control by the employer over the details of the alleged employee's work." *McCarthy*, 572 N.W.2d at 542.

Whether an individual is an employee or an independent contractor is a question of law, so we consider the question of employment status *de novo*. *Fesler*, 688 F.3d at 442. Because this case turns on factors common to the analysis under both federal and state law, we analyze all of Kramer's claims together.

Kramer disputes the district court's findings that the testimony of NCS's principals was "the most persuasive evidence" of "Stolars' relationship to NCS," and that the testimony was "entirely consistent" with the sample contracts in evidence. A typical sample contract provided that the sales representative "is at all times under this Agreement an independent contractor to [NCS]," that he would be "free of Company direction and control," and that he "shall determine his own hours, days, and methods of selling National Credit Systems' services." According to Kramer, however, other evidence contradicted Rehkow and Goldberg and showed that Stolars was an employee.

Kramer's main argument for employee status is that NCS controlled the activities of Stolars and other salespeople by requiring a rigorous training regimen. Kramer relies on two pieces of evidence: that NCS gave its salespeople a lengthy sales manual with specific directions about how to sell NCS's services, and that

Rehkow testified he would call the salespeople five times a week to discuss their progress and offer instruction.

While it is true that NCS distributed a sales manual and that Rehkow maintained telephone contact, Kramer presented no evidence that the sales force was obliged to follow the manual or to accept Rehkow's advice. Instead, Rehkow testified that the salespeople "could market pretty much any way they wanted to," and that "their time [was] their own," such that the sales force could choose how long to work, and whether to work from the office or from home. In fact, the salespeople usually only came to the office two or three times per week. Where a sales representative has the option to set his own schedule and to train himself, he is not subject to the sort of control that exists in the traditional employer-employee relationship. *See Schwieger*, 207 F.3d at 484-85.

Other factors point in both directions. Some favor independent-contractor status. Stolars was paid by commission. He was responsible for his own taxes and insurance. *See id.* at 486. Kramer responds by citing factors that tend to show employment status: NCS provided marketing brochures and order forms used by the sales force; the job required no particular skills except those taught by NCS; and the work of the sales force was an integral part of NCS's business. The primary consideration, however, is the hiring party's control over the means of performance, and we agree with the district court that the weight of the evidence taken as a whole establishes an independent contractor arrangement. As such, we reject Kramer's contention that an employment relationship makes NCS responsible for any e-mail activity by Stolars.

\* \* \*

The judgment of the district court is affirmed.

_____

-9-