# United States Court of Appeals
### For the Eighth Circuit

_____

No. 21-1678
_____

Elizabeth Placzek

*Plaintiff - Appellant*

v.

Mayo Clinic; Mayo Clinic Health System-Southeast Minnesota Region

*Defendants - Appellees*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: October 20, 2021
Filed: November 30, 2021
_____

Before GRUENDER, ERICKSON, and STRAS, Circuit Judges.
_____

GRUENDER, Circuit Judge.

Dr. Elizabeth Placzek worked for Mayo Clinic Health System-Southeast Minnesota Region ("MCHS") as an emergency-room physician with a clinical appointment at Mayo Clinic in Rochester ("Mayo Clinic"). After Mayo Clinic terminated her appointment and she resigned from MCHS, Dr. Placzek sued MCHS and Mayo Clinic, alleging breach of contract as well as violations of the Minnesota Whistleblower Act (MWA), Minn. Stat. § 181.932, and the Minnesota Payment of

Wages Act (MPWA), Minn. Stat. § 181.101. The district court[1] granted summary judgment in favor of the defendants. Dr. Placzek appeals, and we affirm.

**I.**

Dr. Placzek is an emergency-room physician. In 2013, she entered into a Physician Employment Agreement ("employment agreement") with MCHS to work as a Clinical Associate. The Clinical Associate Program allowed physicians to work at an MCHS site location and at Mayo Clinic in Rochester. The employment agreement provided that Placzek would work full-time—"80% in Austin and 20% in Rochester St. Mary's (RST), as determined by Employer [MCHS] under its policies for full-time physician employees." (emphasis omitted). It also had a choice-of-law provision designating the law of the state of the employer's principal business office as the governing law.

Clinical Associate appointment recommendations are made jointly between MCHS and Mayo Clinic, and Mayo Clinic must approve all Clinical Associate appointments and renewals. The Clinical Associate Policy provides that "[p]rimary appointment, oversight and accountability will reside at the MCHS site; [Mayo Clinic] will conduct annual assessments based on [Mayo Clinic] performance measures and may share the feedback with the physician's MCHS Medical Director. It is expected that performance concerns will be communicated mutually between [Mayo Clinic] and MCHS." MCHS paid Clinical Associates the MCHS salary for work at MCHS and the Mayo Clinic salary for work at Mayo Clinic, and Mayo Clinic reimbursed MCHS for salary earned for Mayo Clinic work.

Each physician received a full-time equivalency (FTE) level, which corresponded to the number of hours they were expected to work per year. For example, a 1.0 FTE was equivalent to 1,680 hours per year. If the number of

---

[1]The Honorable Joan N. Ericksen, United States District Court Judge for the District of Minnesota.

assigned annual shifts was not divisible by four, MCHS would round up and require the physician to work an extra half-shift per quarter. At the end of each quarter, each physician was given a true-up payment for the shifts they worked above their FTE.

In September 2015, Dr. Placzek had a miscarriage, which required surgery, recovery time, and related doctor's appointments. Dr. Placzek contacted her medical director to tell her that she would be absent for at least one shift and contacted her whenever she needed to miss other shifts. MCHS provides Short-Term Disability (STD) benefits to Consulting Staff, which includes Dr. Placzek. STD benefits are not mentioned in the employment agreement, but the agreement incorporated other benefit, compensation, and vacation policies. According to the short-term disability policy, "[f]or absences that fit the definition of 'serious health condition' under [the Family Medical, Personal Medical, and Parental Leaves policy (FMLA)], staff members are expected to submit a FMLA leave request via Employee Self Service."

Dr. Placzek did not submit a formal STD claim in 2015 and did not receive STD benefits at the time of her miscarriage. MCHS states that in 2017 it became aware that Dr. Placzek might have been entitled to STD benefits for the 2015 miscarriage. In 2017, MCHS gave Dr. Placzek five days of STD benefits for the 2015 miscarriage, which it claims it calculated the same way it would have in 2015.

In 2016, Dr. Placzek took a twelve-week maternity leave, which was allowed under the Family Medical, Personal Medical, and Parental Leaves (FMLA) policy. Under this policy, Dr. Placzek was entitled to use STD benefits for the first six weeks. Dr. Placzek was paid STD benefits based on her assigned FTE. At the time, Dr. Placzek was assigned a .7 FTE at MCHS but, due to rounding up half-shifts, worked the equivalent of a .7143 FTE.

For the last six weeks of maternity leave, Dr. Placzek took vacation time. The FMLA policy states that for the last six weeks of maternity leave, "[t]he staff member may . . . use vacation or unpaid leave of absence," depending on "individual eligibility." The employment agreement provided that "Physician shall also be

entitled to take time off for vacation," but only "as determined by [MCHS] under its related policies and procedures." Several policies and procedures referenced vacation, such as the Physician Benefit Highlights, listing the number of vacation days by tenure, and the Professional Absence Record, stating that "[i]f there are enough available vacation days, time is paid. If Vacation balance is insufficient, time may be converted to personal unpaid leave."

As an MCHS employee, Dr. Placzek was eligible for an educational-loan reimbursement of $15,000 per year. Under the policy, if the physician terminates the agreement "except for a breach by the Medical Center or in the event the Medical Center terminates this Agreement for cause," the physician must repay the prior two reimbursements. In 2017, Dr. Placzek resigned from MCHS. Dr. Placzek's clinical appointment at Mayo Clinic had already been terminated unilaterally by Mayo Clinic in 2016.

In October 2018, Dr. Placzek brought an MWA claim against Mayo Clinic alleging that Mayo Clinic retaliated against Dr. Placzek for reporting a violation of law. Dr. Placzek also brought a breach-of-contract claim against MCHS for (1) failing to provide additional days of STD benefits for her 2015 miscarriage, (2) improperly paying her STD benefits for her 2016 maternity leave at a lower rate than was required, and (3) not allowing her to use paid vacation for part of her maternity leave. She asked the district court for a declaratory judgment that MCHS breached the contract and that she does not need to repay her educational-loan reimbursement. Lastly, she alleged that MCHS violated the MPWA by failing to pay her earned wages during her 2016 maternity leave. The district court granted summary judgment to Mayo Clinic and MCHS on all claims. Dr. Placzek appeals.

## II.

We review a grant of summary judgment *de novo*. *Johnson Tr. of Operating Eng'rs Loc. #49 Health & Welfare Fund v. Charps Welding & Fabricating, Inc.*, 950 F.3d 510, 520 (8th Cir. 2020). "Summary judgment is proper if there are no

genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Green Plains Otter Tail, LLC v. Pro-Env't, Inc.*, 953 F.3d 541, 545 (8th Cir. 2020). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.*

## A.

First, we consider Dr. Placzek's MWA claim against Mayo Clinic. The MWA prohibits an employer from retaliating against an employee when the employee "in good faith[] reports a violation . . . to an employer." Minn. Stat. § 181.932, subd. 2. Under the Act, "employee" means "a person who performs services for hire in Minnesota for an employer" not including "an independent contractor." Minn. Stat. § 181.931, subd. 2. Dr. Placzek argues that she can bring an MWA claim against Mayo Clinic because she was an employee of Mayo Clinic.

To determine whether someone is an employee or an independent contractor, Minnesota courts consider "(1) [t]he right to control the means and manner of performance; (2) the mode of payment; (3) the furnishing of material or tools; (4) the control of the premises where the work is done; and (5) the right of the employer to discharge." *Guhlke v. Roberts Truck Lines*, 128 N.W.2d 324, 326 (Minn. 1964). The most important factor "is the right of the employer to control the means and manner of performance." *Id.* Minnesota courts do not require that all factors weigh in one direction to find employee or independent-contractor status. *See, e.g., St. Croix Sensory Inc. v. Dep't of Emp. & Econ. Dev.*, 785 N.W.2d 796, 800-04 (Minn. Ct. App. 2010). "Whether an individual is an employee or independent contractor is a mixed question of law and fact." *Id.* at 799. "Once the controlling facts are determined, the question whether a person is an employee becomes one of law." *Jenson v. Dep't of Econ. Sec.*, 617 N.W.2d 627, 629 (Minn. Ct. App. 2000). We review questions of law *de novo*. *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 (2014); *Kramer v. Cash Link Sys.*, 715 F.3d 1082, 1086 (8th Cir. 2013) ("[T]he standard of review is a procedural issue that is governed by federal

-5-

law."). Here, the parties agree on the controlling facts; thus, we review *de novo* whether Dr. Placzek was an employee or an independent contractor of Mayo Clinic.

We begin with the control factor. Although control is usually the most important factor,

> the issue of control is less useful in the context of emergency room physicians than in some other settings because a hospital must assert a degree of conflicting control over every doctor's work . . . to discharge its own professional responsibility to patients, regardless whether the physician is an employee or independent contractor.

*Glascock v. Linn Cnty. Emergency Med., PC*, 698 F.3d 695, 698 (8th Cir. 2012) (internal quotation marks omitted) (interpreting federal common law but using a similar test to *Guhlke*). When evaluating control, we can consider facts such as scheduling, performance reviews, restrictions on a physician's ability to work elsewhere, and whether a physician can refuse to perform services or see patients. *See Glascock*, 698 F.3d at 698 (finding the control factor inconclusive when the hospital "set [the physician's] schedule based on her availability and preferences, urged her to attend monthly meetings, and regularly reviewed her performance," but the physician "determined which patients she would see" and was "pretty much on [her] own"); *Cunningham v. Herbert J. Thomas Mem'l Hosp. Ass'n*, 737 S.E.2d 270, 280 (W. Va. 2012) (discussing whether a doctor was required to work exclusively at the hospital).

Here, although Mayo Clinic approved Clinical Associate appointments, scheduled Dr. Placzek, decided her compensation rate, supervised her, and gave her performance reviews, this does not mean that Mayo Clinic controlled Dr. Placzek. MCHS retained "[p]rimary appointment, oversight and accountability," MCHS jointly made Clinical Associate appointment recommendations with Mayo Clinic, and Mayo Clinic's performance reviews followed the MCHS assessment process. Mayo Clinic did not control how many hours Dr. Placzek worked; MCHS approved her time at Mayo Clinic, even though Mayo Clinic scheduled her; and Mayo Clinic

did not control where else she worked like MCHS did.  True, unlike *Glascock*, it is unclear whether Dr. Placzek could decide which patients to see, but the other facts suggest that Mayo Clinic did not control Dr. Placzek.  *See Glascock*, 698 F.3d at 698.  In sum, though it is a close call, we find on these facts that this factor weighs in favor of independent-contractor status.

Second, considering the mode of payment, Dr. Placzek was paid only by MCHS, but Mayo Clinic set its own pay rate that was different from MCHS, and Mayo Clinic reimbursed MCHS for Dr. Placzek's work at Mayo Clinic.  Even though Mayo Clinic reimbursed MCHS and set the payment rate, this factor favors independent-contractor status because Dr. Placzek was paid by MCHS.  *See Cunningham*, 737 S.E.2d at 278 (applying a similar test to *Guhlke* and holding that this factor favored independent-contractor status when a hospital did not pay the doctors directly but reimbursed the doctors' employer).

Normally, the third and fourth factors would weigh in favor of Dr. Placzek being considered an employee of Mayo Clinic because it furnished medical equipment and controlled the hospital premises.  Not so, however, when considering medical staff because all medical staff "must work inside the hospital using its equipment." *Alexander v. Avera St. Luke's Hosp.*, 768 F.3d 756, 763 (8th Cir. 2014) (interpreting federal common law but using a similar test to the Minnesota one); *see also Boily v. Comm'r of Econ. Sec.*, 532 N.W.2d 607, 607, 609 (Minn. Ct. App. 1995) (finding that dentists were independent contractors when the owner of the dental clinic "provide[d] the major equipment needed" but "[t]he dentists provide[d] their own chosen small tools, malpractice insurance, and continuing dental education"). Thus, we find that this factor is inconclusive.

Fifth, the right of termination is expressly given only to MCHS in the employment agreement.  Neither the employment agreement nor the Clinical Associate Policy says whether Mayo Clinic could unilaterally terminate Dr. Placzek's Clinical Associate appointment, though it did just that, despite appointment recommendations being made jointly between Mayo Clinic and

MCHS. Mayo Clinic could not terminate Placzek's employment with MCHS—the termination letter states "[y]ou will remain an employee of MCHS." Because no document granted Mayo Clinic any right to termination, this factor weighs in favor of independent-contractor status. *See Cunningham*, 737 S.E.2d at 278 (finding that this factor favored independent-contractor status when the agreement did not grant the hospital power to dismiss the doctors from the hospital or from their employer).

In sum, no factors weigh in favor of employee status, and three weigh in favor of independent-contractor status, so we conclude that Dr. Placzek was an independent contractor and not an employee of Mayo Clinic. Thus, the district court properly granted summary judgment for Mayo Clinic on Dr. Placzek's MWA claim.

### B.

Next, we consider Dr. Placzek's breach-of-contract claims, which are governed by Minnesota law because of the employment agreement's choice-of-law provision. *Allianz Ins. Co. of Canada v. Sanftleben*, 454 F.3d 853, 855 (8th Cir. 2006). Under Minnesota law, the elements of a breach-of-contract claim are: "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014). At issue here is the third element—whether MCHS breached the contract. Dr. Placzek identifies three instances when MCHS allegedly breached the contract.

First, Dr. Placzek claims that MCHS breached the contract by giving her only five rather than twelve days days' worth of STD benefits for her 2015 miscarriage. Before addressing the merits of this claim, we must determine whether it was timely filed. The statute of limitations for claims involving the payment of wages is two years, unless "nonpayment is willful and not the result of mistake or inadvertence," in which case it is three years. Minn. Stat. § 541.07(5). Dr. Placzek concedes that her complaint is timely only if the three-year statute of limitations applies.

-8-

Nonpayment was "willful" only if it amounted to an "intentional and deliberate breach of an obligation to pay agreed upon wages." *Levin v. C.O.M.B. Co.*, 441 N.W.2d 801, 805 (Minn. 1989). We assume without deciding that short-term disability payments qualify as wages under Minnesota law. *See Wolfe v. 3M Short-Term Disability Plan*, 176 F. Supp. 2d 911, 915 (D. Minn. 2001) (applying the statute of limitations in section 541.07(5) to a claim for disability benefits under ERISA).[2]

Dr. Placzek argues that her claim falls within the three-year statute of limitations because MCHS's nonpayment was willful. First, Dr. Placzek argues that in 2015 MCHS was aware of her STD claims yet failed to pay her STD benefits, thereby "intentional[ly] and deliberate[ly] breach[ing]" the contract. *See Levin*, 441 N.W.2d at 805. Dr. Placzek claims that in 2015 she informed MCHS of her miscarriage by telling her medical director that she needed time off. Dr. Placzek admits, however, that she did not specifically request STD benefits and instead discussed with her medical director scheduling for the days she would need to take off. Dr. Placzek also claims that she identified specific days for which she is entitled to STD benefits, but she cannot identify a communication from 2015 where she specifically requested twelve days off and admits that there is no record of her request. And MCHS explained that as soon as it found out about Dr. Placzek's 2015 STD claim, "[it] did what was the right thing to do," which was "to look into it at that point and try to make it right with her," and paid her five days of STD benefits despite the Recovery and Claims department originally determining that she was entitled to only three days. On these facts, no reasonable jury could find that Dr. Placzek carried her burden of showing that MCHS "intentional[ly] and deliberate[ly] breach[ed]" the contractual agreement by failing to pay STD benefits to Dr. Placzek in 2015. *See Levin*, 441 N.W.2d at 805; *cf. Wang v. Jessy Corp.*, No. 17-5069, 2020 WL 3618596, at *3-4 (D. Minn. July 2, 2020) (finding a genuine dispute of material fact as to whether nonpayment of overtime was "willful" when the employer "transported his employees to and from work, set their work schedule, monitored

---

[2]The parties do not argue that ERISA applies in this case and therefore we do not address ERISA.

their daily work," the restaurant lacked an overtime policy, and employees worked at least 48 hours per week). Therefore, Dr. Placzek's claim for STD benefits for her 2015 miscarriage is barred by the statute of limitations. Thus, the district court properly granted summary judgment for MCHS on the issue of whether MCHS's nonpayment of STD benefits was a breach of the contract.

Second, Dr. Placzek claims that MCHS breached the contract by paying her STD benefits for her 2016 maternity leave based on her assigned FTE rather than her "actual," higher FTE. "No statute or case law in Minnesota mandates the terms on which paid time off must be offered, or that it be offered at all." *Lee v. Fresenius Med. Care, Inc.*, 741 N.W.2d 117, 126 (Minn. 2007). Thus, Dr. Placzek must show that MCHS had a contractual obligation to pay STD benefits at her actual FTE. Dr. Placzek has not met this burden because she has not identified a contractual provision that entitles her to STD benefits calculated at her "actual" FTE. In fact, none of MCHS's documents uses the phrase "actual" FTE. The employment agreement does not discuss STD benefits or how they are calculated, and MCHS's STD policy does not say that STD benefits are based on an employee's "actual" rather than assigned FTE. MCHS testified that STD payments are calculated based on an employee's salary, and emergency-room physicians' salary is based on their "specific FTE," referring to what Dr. Placzek calls her assigned FTE, and adjusted quarterly to account for "actual shifts worked." MCHS never calculated an "actual" FTE and therefore no reasonable jury could find that STD benefits were based on the employee's "actual" FTE. Thus, the district court properly granted summary judgment for MCHS on the issue of whether Dr. Placzek was entitled to STD benefits based on her actual rather than assigned FTE.

Third, Dr. Placzek claims that MCHS breached the contract by failing to recognize the second half of her maternity leave as paid rather than unpaid vacation time. Dr. Placzek argues that MCHS's policies grant her paid vacation time and that even if MCHS's interpretation that they do not grant her paid vacation is reasonable, the contract is ambiguous and a jury must resolve the ambiguity. "When interpreting a contract, we look to its language to determine the parties' intent." *Savela v. City*

-10-

*of Duluth*, 806 N.W.2d 793, 796 (Minn. 2011). "[W]e assign unambiguous contract language its plain meaning." *Id.* at 796-97. "The determination of whether a contract is ambiguous is a question of law." *Current Tech. Concepts, Inc. v. Irie Enters., Inc.*, 530 N.W.2d 539, 543 (Minn. 1995). "In making that determination, a court must give the contract language its plain and ordinary meaning." *Id.* "A contract is ambiguous if its language is reasonably susceptible of more than one interpretation." *Id.*

Dr. Placzek was not entitled to any paid vacation time under her employment agreement or any other policies. The employment agreement provides that "Physician shall . . . be entitled to take time off for vacation . . . as determined by Employer under its related policies and procedures." It does not provide for paid vacation days. Dr. Placzek argues that although the employment agreement does not specify paid vacation, the references to paid vacation in other policies make clear that the employment agreement means paid vacation. Dr. Placzek's argument fails because the policies she cites do not state that she had paid vacation time. For example, she cites two policy provisions that explain how employees who do have paid vacation time may use it for FMLA leave, but neither states that emergency-room physicians have paid vacation time. She also points to the "Physician Benefit Highlights 2013," which provides the number of vacation days an employee receives based on tenure. But it too does not specify that vacation days are paid. Finally, she cites the Professional Absence policy which states that "[i]f there are enough available vacation days, time is paid." This policy is incompatible with Dr. Placzek's compensation structure, which requires emergency-room physicians to work a certain number of hours per year and shifts per quarter, meaning they must make up any missed shifts. And the policy does not state that emergency-room physicians have paid vacation days, but rather provides the codes employees should use to record vacation time, assuming they have it. In sum, the plain language of the agreement and policies does not guarantee Dr. Placzek paid vacation, and the employment agreement is not "reasonably susceptible to more than one interpretation." *See Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 691 (Minn. 2018). Thus, the district court properly granted summary

judgment for MCHS on the issue of whether Dr. Placzek was entitled to use paid vacation for her 2016 maternity leave.

C.

Finally, we turn to Dr. Placzek's MPWA and declaratory-judgment claims. These claims fail because they are derivative of Dr. Placzek's breach-of-contract claims. The MPWA "is a timing statute, mandating not *what* an employer must pay a discharged employee, but *when* an employer must pay a discharged employee." *Lee*, 741 N.W.2d at 125. Because Dr. Placzek is not entitled to payment for breach of contract, her MWPA claim fails and she is not entitled to a declaratory judgment that MCHS breached the contract or that she does not need to repay her educational-loan reimbursement. Thus, the district court properly granted summary judgment for MCHS on Dr. Placzek's MPWA and declaratory-judgment claims.

**III.**

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of the defendants.

_____

-12-